**Lenore Berry Ross STOREY,
Plaintiff–Appellee,**

v.

**Carl D. STOREY, Jr., Defendant–
Appellant.**

Court of Appeals of Tennessee,
Western Section, at Nashville.

Jan. 17, 1992.

Application for Permission to Appeal
Denied by Supreme Court
May 18, 1992.

Phillip E. Smith, Craig H. Brent, Nashville, for plaintiff-appellee.

Harlan Dodson, III, Lucinda E. Smith, Nashville, for defendant-appellant.

FARMER, Judge.

Lenore Berry Ross Storey (wife) was awarded a divorce from Carl D. Storey, Jr. (husband) on the grounds of adultery. After reviewing the record, we adopt the following facts found by the trial court:

Lenore and Carl Storey married August 13, 1983, after a somewhat stormy romance wherein they were both married to other people when they started seeing each other. After both obtained a divorce from their then spouses, they married each other and began a marriage that has lasted approximately seven and one-half (7½) years, the last year and one-half of which they have been separated. Mr. and Mrs. Storey immediately began to acquire marital property upon their marriage. They acquired an extensive array of personal property which is presently in storage with a lien upon it or which has been mostly dissipated by the parties at this point. Basically, the parties are broke financially except some personal property that has a lien on it for storage costs. Mr. Storey has taken bankruptcy on debts totaling 8.3 Million Dollars....

Prior to the parties' marriage, Mr. Storey had been in the real estate development business for a number of years and had a large net worth. Mrs. Storey started to work for Mr. Storey prior to their marriage and they became romantically involved in an adultrous [sic] relationship with each other. Both obtained a divorce from their spouses and ultimately married each other. Both Mr. and Mrs. Storey counseled each other on their pending divorce and settlements. After their marriage to each other, Mrs. Storey continued to work with Mr. Storey and moved up to a management and decision making position in the business. The parties started acquiring assets as previously noted and began a lifestyle that few people enjoy or comprehend. Their social life was fast paced and extensive. Mrs. Storey served as Heart Gala Chairman which is one of Nashville's premier social events each year. They purchased a home on Belle Meade Boulevard which is one of Nashville's most desired residential addresses. They purchased an antebellum home in Gallatin, Tennessee, a home in Spring Hill, Tennessee and a home in San Destin,

Florida. After purchasing the home on Belle Meade Boulevard for approximately $500,000, they expended another $750,000 renovating the house. Testimony showed that Mr. Storey wanted to put forth a successful image and Mrs. Storey helped him obtain that goal. Later, Mr. Storey ran for President of the National Realtor's Association and Mrs. Storey helped manage his campaign and did extensive travel and entertaining to assist him in that campaign. He lost the election by three votes.

Sometime during the campaign for the presidency of the National Realtor's Association, Mr. Storey started an adultrous [sic] relationship with another woman and has admitted to affairs with four women during this marriage. Testimony showed that at one time he was having an adultrous [sic] relationship with two women at the same time while still being married to Mrs. Storey. The parties had children from their former marriage, and at best the relationship with each other's children was cool and tense. At about the time the campaign for President of the National Realtor's Association was ending, financial problems started to beset the Storeys' with the 1986 tax law starting to take effect. Mr. Storey had been heavily involved in real estate partnerships and using the depreciation write-offs to off-set income and started to lose those set-offs after the tax law change. Mr. Storey although having a large financial worth, was heavily financed and leveraged on his developments, and could not meet his financial obligations because of cash flow problems and the loss of the write-offs. Even after the divorce was started, Judge Muriel Robinson Rice had issued a restraining order for neither party to dissipate the assets of the estate, but several hundred thousand dollars were dissipated in the financial empire that was falling apart. There is a contempt petition pending on that matter and that will be addressed in a subsequent paragraph.... At the time this divorce matter was heard, the parties had lost the home on Belle Meade Boulevard, the Spring Hill home, the San Destin home and the home in Gallatin is in foreclosure at the present time.

The parties have accumulated an estate which will be addressed in a subsequent paragraph.... It is uncontested that both parties have contributed to the marital estate and made investments which contributed to the marital estate, and it is also uncontradicted that the marital estate was accumulated after the marriage of the parties. The separate property owned by the parties will be ruled on in a separate paragraph.... For all intents and purposes the only property owned by the parties at this time is some furniture and personal property most of which is in storage with a lien upon it.

The Court does not deem it necessary and in the best interest of these parties to recite by chapter and verse all the details of the testimony heard by the Court, suffice it to say that the marriage has deteriorated to such degree that these parties are no longer living together as man and wife. Mrs. Storey is staying with a friend and Mr. Storey is renting an apartment at the Belle Meade Towers on a month to month basis.

Husband appeals from the trial court's order and presents the following issues for review:

1. The Trial Court erred by awarding periodic alimony to a 43 year old wife following a five and one-half year marriage where no legal basis for alimony is shown and when the monthly alimony exceeds the Husband's income.

2. The Trial Court erred by awarding to Mrs. Storey $58,158.00 for her attorney's fees when no legal basis for the award was shown and when Mrs. Storey was awarded assets of $394,000.00 and Mr. Storey has no assets.

3. The Trial Court erred in awarding Mrs. Storey all of the marital property.

4. The Trial Court erred by ordering Mr. Storey to pay the storage costs for personal property awarded to Mrs. Storey.

5. The Trial Court erred in finding Mr. Storey guilty of contempt for failing to pay support, and in awarding Mrs. Storey a judgment, when the past due support had been paid.

6. The Trial Court erred in finding Mr. Storey guilty of contempt for dissipating the assets of the marriage in violation of a Temporary Restraining Order prohibiting him from spending "the parties' assets ... except in the ordinary course of business."

## I. Alimony

The trial court ordered husband to pay wife $2,500.00 per month until she dies or remarries. Husband argues that the trial court erred in awarding the wife alimony of any nature and, in particular, alimony *in futuro.* The husband further argues that, even if an alimony award was proper, the trial court erred by not considering the possibility of rehabilitative alimony as required by T.C.A. § 36–5–101(d).

The statute expresses the general assembly's intent "that a spouse who is economically disadvantaged relative to the other spouse be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance." T.C.A. § 36–5–101(d). The statute then provides that

> [w]here there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, ... then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided ...

*Id.* In determining whether payment for support and maintenance is proper, the court shall consider all relevant factors including the following:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age, and physical and mental condition of each party;

(5) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage.

(6) The separate assets of each party, both real and personal, tangible and intangible;

(7) The provisions made with regard to the marital property as defined in § 36–4–121;

(8) The standard of living of the parties established during the marriage;

(9) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party.

(10) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(11) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

T.C.A. § 36–5–101(d).

The trial judge properly considered these factors in determining that the wife should be awarded alimony. As was in his discretion, he found that "[t]he husband [was] clearly and substantially at fault in the breakup of [the] marriage" and that the wife was without fault. During their marriage, the parties enjoyed a high standard of living. The trial court found that, for the duration of the marriage, the wife had devoted herself to furthering the husband's career. Wife had been receiving psychological counseling and, at the time of trial, had been unable to secure employment. Wife had demonstrated needs, and the trial judge determined that the husband had income available to meet those needs. Al-

though husband testified to an income of only $1,600 per month at trial, there was evidence that his income for the four years preceding the divorce ranged from $384,-065 to $711,239, and the trial judge found that he had the greater earning capacity. We concur with the trial court's finding that husband has the earning capacity required to make the alimony payments. The husband earned a degree at Vanderbilt and had taught at the Owen School of Management. He had been in the commercial real estate business for over 25 years. In addition, there was evidence that the husband had dissipated marital assets.

■ Although we agree with the trial court's decision to award the wife alimony, we find that it was error for the court not to consider the possibility of rehabilitative alimony as directed by T.C.A. § 36–5–101(d). T.C.A. § 36–5–101(d) indicates the general assembly's preference for rehabilitative, temporary alimony awards whenever feasible. The statute directs that, when rehabilitation is not feasible, the court may then grant long-term alimony awards or alimony *in futuro*. According to our reading of the statute, therefore, the granting of alimony *in futuro* requires a threshold determination by the trial judge that, considering all relevant factors, rehabilitation of the economically disadvantaged spouse is not feasible.

The record does not reveal that the trial judge made such a determination; and, in fact, our review of the record indicates that the wife is a likely candidate for rehabilitation. The parties were married 7½ years. Prior to the marriage, the wife worked as a realtor and securities broker at three different companies, including the husband's. At trial, the wife stated she had worked on a commission basis and could not remember what her earnings were. The wife, who was 43 years of age at the time of trial, had attended college for four years but did not obtain a degree. She had been seeing a licensed clinical psychologist for counseling due to distress related to the divorce. The psychologist, Dr. Tim Lynch, testified that the wife would require continued treatments of approximately 6 months.

Although the psychologist testified that in the past the wife had been clinically depressed and unable to work at times, he also testified that she had been able to go on job interviews and do some part-time work. There was no indication that these psychological problems were permanent or would prevent her from working in the future. The wife testified to some health problems, including phlebitis and an unspecified heart problem. Again, however, there was no evidence that these conditions would affect her ability to work.

As indicated, our review of the record shows no significant barriers to the wife's rehabilitation. Therefore, we find it appropriate to modify the award of alimony *in futuro* to an award of rehabilitative alimony *in solido*. We affirm the monthly amount of $2,500 and hold that payments in this amount shall continue for a period of thirty-six (36) months, from March 12, 1991, through February 12, 1994. This award shall not be contingent upon the wife's death or remarriage. In addition, we affirm that part of the trial court's order directing the husband to provide health insurance for the wife for a period of three (3) years.

## II. Attorney's Fees

■ The decision to award attorney's fees to a party in a divorce proceeding is within the sound discretion of the trial court and will not be disturbed upon appeal unless the evidence preponderates against such a decision. *Batson v. Batson*, 769 S.W.2d 849, 862 (Tenn.App.1988); *Lyon v. Lyon*, 765 S.W.2d 759, 762–63 (Tenn.App. 1988).

■ The trial court, in awarding attorney's fees to the wife as alimony *in solido*, found that

the wife [was] almost completely without resources, and ... that the husband's greater financial strength and ability [was] such that equity require[d] him to pay the wife's attorney's fees, it being the intention of the [trial court] to preserve in tact [sic] for the wife, the use of the division of any of the marital proper-

ty she receives for her long term security.

As with any alimony award, in deciding whether to award attorney's fees as alimony *in solido*, the trial court should consider the relevant factors enumerated in T.C.A. § 36–5–101(d). As indicated previously, we find that the trial judge properly considered these factors, including the husband's fault in the breakup of the marriage, and that the evidence does not preponderate against his decision to award the wife her attorney's fees.

■ On appeal, the wife has requested that this court award attorney's fees necessitated by the husband's appeal. In *Baggett v. Baggett*, 512 S.W.2d 292, 294 (Tenn. App.1973), this Court held that an award of attorney's fees was inappropriate where both parties were partially successful on appeal. We decline, in this case, to award the wife attorney's fees incurred on appeal.

### III. Division of Marital Property

■ The trial court found that the only marital property existing at the time of the trial was furniture acquired by the parties during their marriage and a home in Gallatin which was in foreclosure. The court awarded all of the marital property to the wife.

T.C.A. § 36–4–121 directs the trial court to consider the following factors in making an equitable division of marital property:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemak-

er, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled his or her role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time division of property is to become effective;

(9) The tax consequences to each party; and

(10) Such other factors as are necessary to consider the equities between the parties.

This statute vests wide discretion in the trial judge to adjust and adjudicate the parties' rights to and interests in marital property. *Batson*, 769 S.W.2d at 859.

The trial judge found that the wife had devoted most of her married life to enhancing the career of the husband and that the husband had the greater ability to acquire assets and income in the future. The court noted that the breakup of the parties' marriage had adversely affected the wife's mental health. Further, the court found that the wife had been forced to sell personal property pending the divorce hearing because of the husband's failure to pay court-ordered support, and there was evidence that the husband had dissipated marital assets in contravention of the court's specific orders. Between May 1989 and the date of trial, the husband spent in excess of $450,000.

Because of a voluntary bankruptcy petition filed by the husband after the wife initiated this divorce proceeding, the husband had virtually no assets at the time of trial. The wife was allowed to retain property worth approximately $394,000, which included separate and marital property. In view of the above circumstances, however, we find no error in the trial court's award of all of the marital property, valued at approximately $84,000, to the wife.

### IV. Payment of Storage Lien

■ We also hold that the trial court did not err in ordering the husband to dissolve

the storage lien so that the wife would have access to marital and separate property.

In *Hanover v. Hanover,* 775 S.W.2d 612 (Tenn.App.1989), this Court held that

[w]hen, after the equitable division of the marital assets there remain obligations of the parties, the court has the discretion to order the payment of the obligations in such a manner that is just and equitable, considering the respective earning capacities of the spouses and the other relevant factors enumerated in [T.C.A. § 36–4–121].

*Id.* at 614. Given the husband's greater earning capacity and our previous discussion of the other relevant factors enumerated in T.C.A. § 36–4–121, we find no abuse of discretion by the trial judge.

### V. Contempt

The trial court found the husband in contempt of court for failing to pay the wife support and for dissipating marital assets in contravention of specific court orders. Husband was sentenced to ten (10) days in the Davidson County Workhouse for each finding of contempt.

In *Robinson v. Gaines,* 725 S.W.2d 692 (Tenn.Crim.App.1986), the Court of Criminal Appeals described the difference between civil and criminal contempt:

The punishment in a civil contempt is remedial, compelling the doing of something by the contemnor, which, when done, will work his discharge. Civil contempt judgments coerce the contemnor into complying with an order of the court. It is often said that in civil contempt cases, the contemnor has the keys to the jail in his own pocket. See *Shiflet v. State,* 217 Tenn. 690, 400 S.W.2d 542 (1966).

On the other hand, criminal contempts are punitive in character. These proceedings are to vindicate the authority of the law and the court as an organ of society. In criminal contempt cases, the contemnor must serve the sentence imposed whether or not he purges himself by complying with the court order. One convicted of criminal contempt does not

carry the key to the jail in his pocket. *Shiflet v. State, supra.*

*Id.* at 694.

The finding of contempt in the case at bar was by definition criminal in that the husband was being punished for his "failure to comply with the prior orders of the court." *Crabtree v. Crabtree,* 716 S.W.2d 923, 925 (Tenn.App.1986). The trial court's order did not state that the husband could avoid the sentences by obeying the Court's previous orders and thus purging himself. *Id.*

Because the contempt was criminal in nature, the husband was entitled to all the constitutional protections of any criminal defendant, including "the presumption of innocence and the right to require guilt to be shown beyond a reasonable doubt," *id.* (citing *Strunk v. Lewis Coal Co.,* 547 S.W.2d 252, 253 (Tenn.Crim.App.1976), the right not to incriminate himself, and notice. *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 444–46, 31 S.Ct. 492, 499–500, 55 L.Ed. 797, 807–08 (1911).

The husband has challenged the trial court's findings of criminal contempt on the grounds that the contempt petition did not provide notice that the husband was being charged with criminal contempt and that the petitioner failed to prove the husband's contempt beyond a reasonable doubt.

With regard to notice, the United States Supreme Court stated in *Gompers* that

manifestly every citizen, however unlearned in the law, by mere inspection of the papers in contempt proceedings ought to be able to see whether it was instituted for private litigation or for public prosecution, whether it sought to benefit the complainant or vindicate the court's authority. He should not be left in doubt as to whether relief or punishment was the object in view. He is not only entitled to be informed of the nature of the charge against him, but to know that it is a charge and not a suit.

*Id.* at 446, 31 S.Ct. at 500, 55 L.Ed. at 807–08.

In addition, Rule 42(b) of the Tennessee Rules of Criminal Procedure requires that a criminal contempt be prosecuted on notice, which "shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and *describe it as such.*" Tenn.R.Crim.Proc. 42(b) (emphasis added).[1]

Our review of the record indicates that none of the contempt petitions against the husband designated the contempt as criminal.[2] Apparently, the nature of the contempt did not become known to the parties until the trial court entered its memorandum opinion sentencing the husband to a set time in the county workhouse and providing no opportunity for the contemnor to purge himself.

Because the husband was not afforded proper notice as required by the Tennessee Rules of Criminal Procedure and *Gompers, supra,* we find it necessary to reverse that part of the trial court's order sentencing the husband to two 10–day periods in the county workhouse.

### VI. Conclusion

The judgment of the trial court awarding wife spousal support is modified to $2,500.00 per month for thirty-six (36) months. The sentences for criminal contempt are reversed. The judgment of the trial court is in all other respects affirmed. The cause is remanded for any further proceedings consistent with this opinion. Costs of this appeal are taxed one-half to the appellant and one-half to the appellee for which execution may issue if necessary.

CRAWFORD and HIGHERS, JJ., concur.

---

**1.** This notice is not required where the conduct constituting the contempt occurs in court and is witnessed by the judge. Tenn.R.Crim.App. 42(a).

**2.** A post-trial petition for contempt was filed by the wife June 28, 1991, which specifically requested the court to find the husband in criminal contempt; however, this petition is not before this court.