**Richard Murry HAWKINS, Plaintiff and Counter Defendant–Appellee**

v.

**Glenda George HAWKINS, Defendant and Counter Plaintiff–Appellant.**

Court of Appeals of Tennessee, Eastern Section.

March 30, 1994.

Permission to Appeal Denied by Supreme Court June 27, 1994.

of "grossly inappropriate marital conduct." She asked for a divorce, an equitable division of marital property, and alimony in futuro. Murry, for answer, admitted Glenda was "entitled to an absolute divorce" and an equitable division of the marital property. He denied, however, she was entitled to "permanent" alimony.

The parties entered into a "Stipulation and Agreement" which, as pertinent here, stipulated Mrs. Hawkins was entitled to a divorce based on Mr. Hawkins's inappropriate marital conduct. They also agreed on a division of marital property, each party receiving approximately 50% of the property. They were unable, however, to agree on the amount, if any, of alimony to which Mrs. Hawkins was entitled.

On January 26, 1993, the court entered an order awarding Mrs. Hawkins a divorce based on Mr. Hawkins's inappropriate marital conduct. He also incorporated in his judgment the property settlement which the parties had entered into. As pertinent here, the parties agreed the marital residence would be put on the market for sale and Mr. Hawkins would pay the monthly payments of interest on the mortgage on the residence until it was sold. The court, however, took the issue of alimony under advisement and did not dispose of that issue at that time.

Frank B. Bird with Bird, Navratil, Bird, Kull & McCroskey, Maryville, for appellant.

R.D. Hash, Maryville, for appellee.

## OPINION

CLIFFORD E. SANDERS, Senior Judge.

The Defendant and Cross Complainant appeals from the amount of rehabilitative alimony awarded to her in her divorce proceeding. We find the amount to be inadequate, and modify the judgment.

Appellant Glenda Hawkins and Appellee Murry Hawkins were married in 1982. It was the second marriage for Glenda and the third marriage for Murry. No children were born to the marriage. In 1992, as pertinent here, Glenda filed a counter complaint against Murry for a divorce on the grounds

On March 1, 1993, the court filed a memorandum opinion. The court found Mr. Hawkins should continue paying the monthly interest payments on the marital residence until it was sold. After the sale of the house, Mr. Hawkins should pay Mrs. Hawkins, as rehabilitative alimony, the sum of $1,000 per month for 30 months, for a total of $30,000.

On March 31, Mrs. Hawkins filed a "Motion for Modification of the Court's Memorandum Opinion and Order so as to Increase the Amount of Rehabilitative Alimony Awarded Counter-plaintiff." On the following day, April 1, the court entered a final judgment in the case in keeping with his memorandum opinion and without passing on Mrs. Hawkins's motion filed the day before. On July 23, the court entered an order denying Mrs. Hawkins's motion of March 31 and

on August 19 Mrs. Hawkins filed notice of appeal from the judgment entered on April 1.

On appeal, Mrs. Hawkins says the evidence preponderates against the court's award of $1,000 per month for 30 months for only $30,000. She insists, as she did at trial, she is entitled to 20% of Mr. Hawkins's gross income for five years. Based on Mr. Hawkins's present income, in excess of $95,000 per year, 20% for five years would total approximately $95,000 distributed in sums of approximately $19,000 per year.

Mr. Hawkins, in his brief, says not only should the court not award Mrs. Hawkins any alimony, but Mrs. Hawkins failed to timely file notice of appeal and it should be dismissed.

We first address the issue of whether or not the notice of appeal was timely filed. We conclude it was. Rule 4(a), TRAP, says in pertinent part:

> **(a) Generally.** In an appeal as of right to the Supreme Court, Court of Appeals or Court of Criminal Appeals, the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from. . . .

Mrs. Hawkins's appeal is from the judgment entered April 1, 1993. Mr. Hawkins argues that because Mrs. Hawkins did not file her notice of appeal until August 19, she did not comply with TRAP 4(a) and therefore cannot appeal.

This argument would be unassailable were it not for TRAP 4(b). As pertinent here, it says:

> **(b) Termination by Specified Timely Motions in Civil Actions.** In a civil action, if a timely motion under the Tennessee Rules of Civil Procedure is filed in the trial court by any party: (1). . . . (5) under Rule 59.04 to alter or amend the judgment; the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion.

*Also see* Rule 59.01, TRCP.

This rule extends TRAP 4(a)'s 30–day limit for filing a notice of appeal until 30 days after a listed motion is granted or denied.

In the case at bar, Mrs. Hawkins filed a Rule 59.04, TRCP, motion, which is one of the motions listed in TRAP 4(b). (Though she called it a motion to reconsider, "it is clearly ascertainable from a reading of the motion that, in substance," it amounts to a motion to alter). *See Bemis Co., Inc. v. Hines,* 585 S.W.2d 574, 575 (Tenn.1979). Rule 8.05(1), TRCP, says: "No technical forms of pleading or motions are required." After the trial court dismissed Mrs. Hawkins's motion on July 23, she filed a notice of appeal on August 19, less than 30 days later.

Rule 4(b)'s extension of time for appeal applies only when the listed motion is timely filed. In *Gassaway v. Patty,* 604 S.W.2d 60 (Tenn.App.1980) this court said: "[I]f the motions enumerated in T.R.A.P., Rule 4(b) terminate the running of the time within which notice of appeal is to be filed, the motion must be 'timely' under the Tennessee Rules of Civil Procedure." *Id.* at 61.

Mr. Hawkins argues that the motion to alter or amend was not timely under TRCP 59.04 because it was filed *before* the entry of the judgment. Rule 59.04 says, "A motion to alter or amend a judgment shall be filed and served within thirty (30) days *after* the entry of the judgment." (Emphasis ours.) Mr. Hawkins argues that Mrs. Hawkins's motion to alter was not timely because she filed it the day *before* the entry of judgment was filed.

To determine whether Mrs. Hawkins's motion was timely, we first examine the language of TRCP 59.04. The key phrase is "within thirty (30) days *after* the entry of judgment." (Emphasis ours.) This language alone does not make clear whether motions made before entry of the final judgment are timely. The drafters may have intended motions to be filed "no later than thirty days after the entry" or "only within the thirty (30) day period after entry, and not before." Because the language itself is not entirely clear, we must look to case law for its interpretation.

We have been cited to no authority, nor have we found any in this jurisdiction, addressing the specific issue before us: Does a motion provided for under the rule, filed

before entry of the final judgment, stay finality of the judgment under Rule 4, TRAP?

In the case of *Grundy County v. Dyer*, 546 S.W.2d 577 (Tenn.1977) our supreme court addressed a very similar issue. The issue was whether a motion for a new trial filed before entry of a final judgment should be dismissed. *Id.* at 579. The court said: "It would be manifestly unjust, absent prejudice to the complaining party, to dismiss this appeal and penalize a lawyer and his client for promptness." *Id.* Since this case, however, came down before the Tennessee Rules of Appellate Procedure became effective July 1, 1979, it would not be controlling in the case at bar.

Though our courts apparently have not addressed the specific question at issue, the federal courts have. Rule 59(e) of the Federal Rules of Civil Procedure is very similar to Rule 54.04, TRCP. Rule 59.04, TRCP, says: "A motion to alter or amend a judgment shall be filed and served within thirty (30) days after the entry of the judgment." Rule 59(e), Federal Rules of Civil Procedure says: "A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment." In construing Rule 59(e) Federal Rules of Civil Procedure, the federal courts have consistently held a pre-judgment motion is "timely."

In the case of *Smith v. Hudson*, 600 F.2d 60, 62 (6th Cir.1979) the appellants had filed a motion to alter or amend before the entry of a final judgment. In addressing the issue, the court said:

First, we recognize that Rule 59(e) contemplates that motions will normally be made following the entry of judgment. . . . It is not unusual, however, for a putative Rule 59(e) motion to predate the formal entry of judgment. This is due to the fact that Fed.R.Civ.P. 58 requires that judgments be entered in a document that is separate from the Court's memorandum opinion. Thus in *Jetero Const. Co., Inc. v. South Memphis Lumber Co.*, 531 F.2d 1348, 1351 (6th Cir.1976), we held that it was proper for the District Court to entertain a motion to alter or amend a judgment under Rule 59(e) even though it was filed prior to the actual entry of judgment.

Thus in this case the plaintiffs' motion cannot be read out of Rule 59(e) solely because it was prematurely filed.

*Also see Hilst v. Bowen*, 874 F.2d 725 (10th Cir.1989) and *Greater Houston Chapter of the ACLU v. Eckels*, 755 F.2d 426 (5th Cir. 1985).

We now turn to the second issue presented in the case at bar: Whether this court should alter the trial court's award of $1,000 per month for 30 months as rehabilitative alimony. After a close examination of the evidence in the record, the appropriate case law, and the factors enunciated in T.C.A. § 36–5–101(d) (1991), we hold the evidence preponderates against the trial court's decision and in favor of a more substantial award for Mrs. Hawkins.

█ We must presume the trial court's decision is correct unless the evidence preponderates against it. *Duncan v. Duncan*, 686 S.W.2d 568, 571 (Tenn.App.1984); *Luna v. Luna*, 718 S.W.2d 673, 675 (Tenn.App. 1986). In determining whether the trial judge's award of alimony is correct, we first analyze the facts of this case under the controlling statute, T.C.A. § 36–5–101(d), and applicable case law. T.C.A. § 36–5–101(d) says: "In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including: . . . ." The statute then lists 11 factors to be considered. We shall hereinafter discuss the ones we deem pertinent in the case at bar.

In applying T.C.A. § 36–5–101(d), our courts have said, "The most common factors considered by the courts are: (1) the need of the innocent spouse; (2) the fault of the obligor spouse; and (3) the obligor spouse's ability to provide support and maintenance." *Bull v. Bull*, 729 S.W.2d 673, 675 (Tenn.App. 1987).

█ In order to appreciate the value of the contribution which Mrs. Hawkins made to the marriage as well as the contribution she made to the financial and professional advancement of Mr. Hawkins, we need to compare the status of Mr. Hawkins at the

inception of the marriage with that at the termination of the marriage. The record shows Mr. Hawkins graduated from law school and was admitted to the Tennessee Bar in 1969. The record is not clear as to what his professional activities were between 1969 and 1982 at the time the parties were married. The record does show that between 1969 and 1982 Mr. Hawkins had gone through two marriages; he owned no property; he owed indebtedness in excess of $70,000 and described himself as "bankrupt." He had abandoned his law profession and was working at the Blount National Bank. Through the efforts of Mrs. Hawkins in managing the finances of the family, hard work, sacrifices and frugal living, Mr. Hawkins's debts were paid. In 1987 he was financially able to leave the bank and return to private law practice. Another factor which, no doubt, also made this possible was that Mrs. Hawkins gave up her employment at the bank and worked as Mr. Hawkins's secretary in his law office. He was appointed United States District Court Clerk in 1989. At the time of the separation of the parties, all of Mr. Hawkins's debts had been paid except the mortgage on a house which they had recently purchased and in which they had an equity of approximately $30,000. They also owned approximately $60,000 worth of stocks and debt-free motor vehicles valued at approximately $24,000. Mr. Hawkins was earning a salary of $95,172 per year.

It is also pertinent that at the time Mrs. Hawkins left her employment at the bank in 1987, she was earning $18,400 per year. After their separation she went back to work for the bank, but at an hourly wage which now pays her approximately $14,000 per year. Also, at the time of the marriage Mrs. Hawkins brought into the marriage approximately $7,500 in cash and a mobile home valued at $4,500.

In applying the factors for consideration under T.C.A. § 36–5–101(d), we first look to (9) which says we should look to "The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or in-creased earning power of the other party." T.C.A. § 36–5–101(d)(9). We think it is important to look at the "intangible contributions" which Mrs. Hawkins made to the marriage and which we think are much greater than the tangible contributions which they both made to the marriage. She salvaged Mr. Hawkins from the stigma of bankruptcy. She made it financially possible for Mr. Hawkins to return to private law practice which, in turn, put him in a position to get the appointment as United States District Court Clerk. We think it is highly unlikely the court would have considered a bank employee who had a history of personal bankruptcy on his record a viable candidate for its clerk.

Mr. Hawkins's testimony is quite descriptive of his plight at the time of the marriage. He said: "I was bankrupt, absolutely. In fact, that's why I ended up in Blount County. I was bankrupt. .... I had debts probably around $70,000. My recollection in law school is there were two definitions of bankruptcy and I met both of them.... I had my car repossessed.... I had garnishment served on me because of my American Express card, which my ex-wife Janice Faye had run up on me." He testified he was planning to take bankruptcy but Ms. Glenda told him she would not marry him if he took bankruptcy and he promised he would not. Because of Mrs. Hawkins's insistence, he did not take bankruptcy and because of her wise and frugal management of their money, Mr. Hawkins escaped bankruptcy; his debts were paid and they reached financial stability. The following exchange between Mrs. Hawkins's counsel and Mr. Hawkins points up how invaluable Mrs. Hawkins's contributions were:

"Q. I believe her [Mrs. Hawkins's] income there was $18,400?

"A. I don't know, Mr. Bird. I'm sure that is probably true. I'm sure what she told it was true. Whatever she would tell you would be true. Glenda kept all of our books. I didn't even have a checkbook as far as I recall. My paycheck went in to the bank, and she took care of everything financially. I had nothing to do with it. I can't remember whether I got an allowance or not. I had money to spend, but every bit of both our

joint income went into a bank account. She handled all of it."

\*     \*     \*

"That debt I promised Glenda I wouldn't bankrupt on to marry her became a terrible weight and load upon our marriage. Glenda has suffered through it, and she managed the books. She did a great job, and she paid off that debt. I'm thankful that she did that, but we paid a price for it."

Mr. Hawkins's testimony makes it clear it was through Mrs. Hawkins's frugality, good management, and willingness to sacrifice to improve their station in life which made it possible for him to have attained the position he is in today. Except for her efforts he would probably still be working in the bank.

At trial, it appeared Mr. Hawkins's strongest objection to paying Mrs. Hawkins alimony was she might save the money rather than spend it. In expressing his opposition to paying Glenda alimony, he said: "Glenda would put her alimony in a savings account, and that's great, but I'm not her retirement plan. . . . But I'm not going to feed her savings account. I know her; she's frugal. I just don't want to feed her savings account at the expense of the rest of my life." Had Mr. Hawkins saved as prudently throughout his career as Glenda Hawkins has, he might not have experienced his brush with bankruptcy.

Not only were Mrs. Hawkins's money management skills and financial sacrifices a substantial contribution to her marriage, they also contributed to Mr. Hawkins's future earning power, which is another factor to be considered under T.C.A. § 36–5–101(d)(9).

Mr. Hawkins and Glenda's counsel had the following dialogue on whether Mrs. Hawkins contributed to Mr. Hawkins's career success:

"Q. And are you presently employed as the clerk of the U.S. District Court in Knoxville?

"A. That's correct.

"Q. I guess Glenda's making you promise not to take bankruptcy probably saved your opportunity at that job?

"A. Mr. Bird, I have thought a lot about that, because I knew that's where you would be coming from. I know Glenda and I know that's where she is coming from. I know that's her philosophy. Bankruptcy is not against the law. It is the law. If I filed bankruptcy eleven years ago, I can't tell whether I would be court clerk or not. . . . . I could have done that and not lost my job. I don't know if it would have changed my life or not. I know it might have made Glenda's life easier."

The evidence is most convincing that Mrs. Hawkins saved Mr. Hawkins from bankruptcy. She was responsible for the payment of his debts. She was responsible for his being able to return to the private practice of law and be in a position for consideration for the position he now holds.

In his argument of the case, counsel for Mr. Hawkins tried to mitigate the importance of Mr. Hawkins's contribution to the marriage. He said, "I feel sorry for my client that he doesn't have that $70,000 now that he paid back to pay his debts." We are unable to share that sympathy.

Another important factor for consideration under T.C.A. § 36–5–101(d) is "the obligor spouse's ability to provide support and maintenance." Mr. Hawkins is a 51–year–old man earning $95,177 per year and his ability to pay is not in dispute.

Also an important statutory factor in the case at bar under T.C.A. § 36–5–101(d)(10) is relative fault. The Stipulation and Agreement between the parties said: "Richard Murry Hawkins ('Murry') has admitted in his Answer to the Counter–Complaint of Glenda Costner Hawkins ('Glenda') that she is entitled to a divorce based on Murry's inappropriate marital conduct. . . ."

In his brief, Mr. Hawkins's counsel says: "On a percentage basis Mr. Hawkins admitted to being 50.0001 per cent at fault. It follows Ms. Hawkins was 49.9999 percent at fault. In a determination of relative fault from this record this court must treat fault as if it is essentially equal." There is no basis in fact for this overly zealous argument. Under the plain language of the stipulation, Mr. Hawkins admitted to inappropriate marital conduct. In *Perry v. Perry*, this court said: "In her pleading and in her sworn

testimony, the plaintiff has admitted adulterous conduct which would entitle defendant to a divorce. This is conclusive against her unless there is other credible evidence which would negative the effect of such admission." *Id.* 765 S.W.2d 776, 779 (Tenn.App.1988). (Citations omitted.) If Mr. Hawkins never committed any inappropriate marital conduct, he should not have stipulated he did. We find Mr. Hawkins to be the sole party at fault.

Evaluating Mrs. Hawkins's claim under the many factors of T.C.A. § 36–5–101(d) is critical because "[n]o hard and fast rule respecting the amount of alimony to be granted can be laid down, and the facts of each particular case must govern." *Walker v. Walker,* 656 S.W.2d 11, 14 (Tenn.App.1983). Though the alimony arrangement must depend upon the unique facts of each case, we find case law dealing with fact patterns similar enough to be insightful. One case similar to the case at bar is *Storey v. Storey,* 835 S.W.2d 593 (Tenn.App.1992). The *Storey* court found the husband had adulterous relationships during the marriage and a much greater ability to acquire assets and income in the future, while the wife had devoted most of her married life to enhancing the career of the husband. *Id.* at 595, 598. The *Storey* court upheld the trial court's award of all the marital property to the wife and modified an award of alimony in futuro to an award of rehabilitative alimony insolido. *Id.* at 597–98.

*Batson v. Batson,* 769 S.W.2d 849, 851 (Tenn.App.1988) is a case involving a husband with a much higher income whose conduct precipitated the divorce and a wife who contributed substantially to the marriage. *Id.* 859. In *Batson,* the court made a substantial award to Mrs. Batson for future maintenance and support.

In a recent case of *Harrington v. Harrington,* 798 S.W.2d 244, 245 (Tenn.App.1990) this court modified a trial court's division of marital property in favor of the wife because the trial court did not adequately account for her age, earning capacity, and limited ability to acquire income in the future. *Harrington* is applicable here because Mrs. Hawkins is over 45 years of age with a limited ability to acquire income in the future.

In addition to the statutory factors and similar cases discussed above, in considering the award of alimony we are governed by the rule that "a wife whose marriage has been shattered by husband's misconduct should not be left in a financial condition inferior to her economic situation prior to the parties' divorce. *Shackleford v. Shackleford,* 611 S.W.2d 598 (Tenn.App.1980)." *Gilliam v. Gilliam,* 776 S.W.2d 81, 86 (Tenn.App.1988).

In her brief, Mrs. Hawkins says that as a result of her having left the work place during her marriage, she is now disadvantaged in her earning capacity and will be unable to recoup the position she would have now had. She analyses her status as follows: "During the period from 1982–1986, her (Mrs. Hawkins's) income had increased about $1,000.00 each year and it is reasonable to conclude that had she not withdrawn from the labor market, that trend would in all probability have continued. Thus, her present earnings are probably some $10,000.00 a year less than they would be if she had not withdrawn from the labor market. This $10,000.00 a year shortfall has probably to date (18–plus months) cost her over $15,000.00 and will continue at that rate for the remainder of her working life—reasonably projected to be some twenty (20) years. This works out to a shortfall of some $200,000.00—the trial judge's award of only $30,000.00 over a thirty-month period makes up only about 15% of her shortfall."

While we are unable to completely embrace Mrs. Hawkins's argument, we cannot say it is without merit. Mrs. Hawkins's leaving the work force is explained by her testimony as follows: "When Murry and I were married, his long range plan was for me to work for five years and then for me to quit, *because he wanted to take care of me.*" (Emphasis ours.) When she left the work force she was justified in believing Murry would take care of her, but Murry broke his promise.

Considering Mr. Hawkins's present income, his marital misconduct which destroyed the marriage, and considering Mrs. Hawkins's low and impaired earning capaci-

ty, her substantial contribution to the marriage, and to Mr. Hawkins's career, equity requires the judgment of the trial court be modified to increase the alimony award from $30,000 to $75,000 and it shall be payable at the rate of $1,500 per month over a period of 50 months. *See Isbell v. Isbell,* 816 S.W.2d 735 (Tenn.1991).

To the extent the trial court's judgment is not modified, it is affirmed. The cost of this appeal is taxed to the Appellee and the case is remanded to the trial court for the entry of a judgment in keeping with this opinion.

FRANKS and McMURRAY, JJ., concur.