# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 3, 1999 Session

## KAREN ELAINE (BROCK) ROTH v. RICHARD DANIEL ROTH

**Appeal from the Circuit Court for Sumner County**
**No. 16684-C      Thomas Goodall, Judge**

---

### No. M1998-00911-COA-R3-CV - Filed March 20, 2001

---

This appeal involves the dissolution of a sixteen-year marriage. The wife filed suit in the Circuit Court for Sumner County seeking a divorce and custody of the parties' three children. The husband did not contest the divorce but requested custody of the parties' two older children. Following a bench trial, the trial court awarded the wife a divorce on the ground of adultery and granted her custody of the children. On this appeal, the husband takes issue with the trial court's valuation of marital property, the allocation of marital debt, and the award of long-term spousal support. We have concluded that the trial court's decisions regarding the valuation of the marital property should be modified but that the remainder of the judgment should be affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Modified and Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

F. Dulin Kelly, Hendersonville, Tennessee, for the appellant, Richard Daniel Roth.

Michael W. Edwards, Hendersonville, Tennessee, for the appellee, Karen Elaine (Brock) Roth.

### OPINION

Richard Daniel Roth and Karen Elaine Roth met in 1980 when they were both stationed at Fort Jackson, South Carolina. Dr. Roth is a dentist, and Ms. Roth a nurse. Dr. Roth did not inform Ms. Roth that he was married when they first began dating. Sometime later, Dr. Roth told Ms. Roth that he and his wife were estranged. Dr. Roth and his then-wife were later divorced, and in June 1981, the parties married in Rome, Georgia.

The parties moved to Enterprise, Alabama where Dr. Roth completed his service obligation. While living there, Ms. Roth obtained a masters degree in nursing from the University of Alabama. The parties' first child was born there in November 1982. Following the completion of Dr. Roth's military service, the parties moved to Tulsa, Oklahoma where Dr. Roth bought an existing dental practice with the assistance of a $30,000, no-interest loan from his father. Ms. Roth was employed full-time, except for a brief period in July 1985 when the parties' second child was born.

In December 1985, Dr. Roth sold his dental practice, and the parties moved to Tennessee in 1986 where Dr. Roth took a job at the Veterans Administration Hospital in Nashville. Ms. Roth obtained employment teaching nursing at Volunteer State Community College. Dr. Roth's father continued to assist the parties financially by extending the term of his loan to Dr. Roth and by giving them $40,000 which the parties used, at least in part, to pay down the mortgage on their home. Ms. Roth gave birth to the parties' third child in April 1988 but continued to teach nursing full-time at Volunteer State Community College.

Ms. Roth was injured in 1989 when a dump truck collided with her automobile. Her injuries required surgery and have caused her to continue to experience pain in her leg and back. She eventually settled her personal injury claim for $123,000 and deposited the proceeds of the settlement into the parties' joint account at First American National Bank. Ms. Roth has not worked full-time since the accident. While her physician has not placed any restrictions on her activities, she works only two days per week at Cumberland University. She continues to take anti-inflammatory drugs and anti-depressants to control her pain. She has not sought full-time employment as a nurse because she believes that practicing or teaching nursing would require her to lift patients or stand for extended periods of time and that both of these activities would be painful to her.

The parties' relationship began to deteriorate in 1996. They began to have heated arguments that sometimes escalated into violent outbursts by Dr. Roth. Ms. Roth eventually discovered that Dr. Roth had been having an extramarital affair since 1993 with a co-worker named Henrietta Johnson and that he had also been involved in a sexual relationship with their next-door neighbor for approximately eight years. The parties separated in March 1997, and Dr. Roth moved in with Ms. Johnson three months later.

On April 1, 1997, Ms. Roth filed suit in the Circuit Court for Sumner County seeking a divorce on the grounds of adultery and inappropriate marital conduct. She also sought custody of the parties' children. Two weeks later, she obtained an order restraining Dr. Roth from having any contact with her. Following a violent confrontation in the parties' home, Ms. Roth sought to have Dr. Roth held in criminal contempt for violating the restraining order. When Dr. Roth filed his answer, he conceded that he had committed adultery, requested custody of the parties' two oldest children, and denied that he had violated the restraining order. In May 1997, the trial court determined that Dr. Roth had violated the restraining order and gave Ms. Roth temporary custody of the children and exclusive possession of the marital home.

Following a trial in September 1997, the trial court filed a final divorce decree on October 30, 1997, awarding Ms. Roth a divorce on the ground of adultery and granting Ms. Roth custody of the parties' three children. The trial court divided the parties' marital estate, set Dr. Roth's child support obligation, and directed Dr. Roth to pay Ms. Roth $5,000 in alimony in solido and $1,000 per month in long-term spousal support. The trial court also directed Dr. Roth to pay for Ms. Roth's health insurance for thirty-six months and to pay her attorney's fees.

On November 26, 1997, Dr. Roth filed a Tenn. R. Civ. P. 59.04 motion, requesting the trial court to allocate several marital debts that it had overlooked and to correct the amounts of the balances in various bank accounts. Two months later, Ms. Roth requested the trial court to amend the final decree to award her the marital home instead of having it sold and dividing the proceeds. The trial court entered an order on February 18, 1998, denying the parties' motions, except for allocating several marital debts not mentioned in the original decree. Dr. Roth perfected this appeal in which he takes issue with the decision regarding custody,[1] the allocation of the parties' debts, the valuation and distribution of the parties' marital property, and the decision to award Ms. Roth long-term spousal support.

## I.
### THE DIVISION OF THE MARITAL ESTATE

Dr. Roth asserts that the trial court erred in its valuation of the parties' marital property and its division of the martial debts and that these errors resulted in an inequitable net division of the parties' marital estate. We concur that the trial court erred by failing to value certain bank accounts based on their balances at the time of the divorce hearing. However, after correcting these errors, we have determined that the net effect of the trial court's division of the marital estate was not inequitable.

### A.

Trial courts should divide the parties' property and debts after they have determined how the parties will be divorced and, if required, the custody and visitation arrangements for the minor children. *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998). Dividing a marital estate necessarily begins with the classification of the property as either separate or marital property. *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996); *McClellan v. McClellan,* 873 S.W.2d 350, 351 (Tenn. Ct. App. 1993). The definitions of "separate property" and "marital property" in Tenn. Code Ann. § 36-4-121(b) (Supp. 2000) provide the ground rules for the task. Once the property has been classified, the trial court's goal is to divide the marital property in an essentially equitable manner. *Kinard v. Kinard*, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998). A division is not rendered inequitable simply because it is not precisely equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Bookout v. Bookout*, 954 S.W.2d 730, 732 (Tenn. Ct. App. 1997),

---

[1] Following the argument of this case, Dr. Roth withdrew the portion of his appeal regarding the custody of the parties' children based upon the parties' resolution of this dispute.

or because each party did not receive a share of every piece of marital property. *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998); *Brown v. Brown,* 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994).

Dividing a marital estate is not a mechanical process but rather is guided by considering the factors in Tenn. Code Ann. § 36-4-121(c). *Kinard v. Kinard*, 986 S.W.2d at 230. Trial courts have wide latitude in fashioning an equitable division of marital property, *Fisher v. Fisher,* 648 S.W.2d 244, 246 (Tenn. 1983); *Brown v. Brown,* 913 S.W.2d at 168, and appellate courts accord great weight to a trial court's division of marital property. *Wilson v. Moore,* 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996); *Edwards v. Edwards,* 501 S.W.2d 283, 288 (Tenn. Ct. App. 1973). Thus, we will ordinarily defer to the trial court's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence. *Brown v. Brown,* 913 S.W.2d at 168; *Mahaffey v. Mahaffey,* 775 S.W.2d 618, 622 (Tenn. Ct. App. 1989); *Hardin v. Hardin,* 689 S.W.2d 152, 154 (Tenn. Ct. App. 1983).

## B.
### THE VALUATION ERRORS

Dr. Roth asserts that the trial court erred with regard to its valuation of three marital assets. He insists that the trial court should have valued two bank accounts based on their balance at the time of the divorce hearing rather than when Ms. Roth filed her divorce complaint and that the valuation of the 1997 Dodge Caravan awarded to Ms. Roth is not supported by the evidence. We agree.

The parties' marital estate included the joint account at First American National Bank, in which Ms. Roth deposited the proceeds from her personal injury settlement, and Dr. Roth's personal account. The trial court valued the joint account at $14,993.20, its balance when Ms. Roth filed her divorce complaint, even though the entire balance of the account had been depleted by the time of the divorce trial in September 1997. Similarly, the trial court valued Dr. Roth's account at $7,635.54, even though there was only $2,000 in the account at the time of the divorce trial.

The valuation of a marital asset is a question of fact. *Kinard v. Kinard*, 986 S.W.2d at 231. Valuation decisions should be made by considering all relevant evidence, and each party bears the burden of bringing forth competent evidence. *Koch v. Koch*, 874 S.W.2d 571, 577 (Tenn. Ct. App. 1993). If the evidence of value is conflicting, the trial court may assign a value that is within the range of values supported by the evidence. *Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995); *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). On appeal, we presume the trial court's factual determinations are correct unless the evidence preponderates against them. *Watters v. Watters*, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997); *Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

We agree with Dr. Roth that the trial court erroneously valued the parties' joint account and Dr. Roth's checking account. When trial courts value marital property, Tenn. Code Ann. § 36-4-121(b)(1)(A) requires them to value the property "as of a date as near as reasonably possible to the final divorce hearing date." *Brock v. Brock*, 941 S.W.2d 896, 902 (Tenn. Ct. App. 1996). When the trial court heard the evidence in September 1997, there was a zero balance in the joint account and $2,000 in Dr. Roth's checking account. Accordingly, the trial court should have adopted these values, rather than the balances in the accounts when Ms. Roth filed her divorce complaint.

The trial court, apparently adopting Ms. Roth's valuation estimate, placed a value on the 1997 Dodge Caravan of $400. However, the evidence shows that the retail value of this vehicle had been $24,425 and that the outstanding car loan was $19,600. Accordingly, the evidence preponderates against the trial court's finding that the value of the vehicle was only $400. For the purposes of dividing the marital estate, the value of the Dodge Caravan should have been $4,825.

The effect of these three valuation errors was to inflate the value of the parties' marital estate at the time of the divorce hearing. In order to correct these errors, the value of the parties' marital property must be reduced by $16,203.74.[2]

## C.
### THE ALLOCATION OF MARITAL DEBT

With the exception of the automobile loan for the 1997 Dodge Caravan that was awarded to Ms. Roth, the trial court overlooked three marital debts in its October 30, 1997 decree. As a result, Dr. Roth filed a Tenn. R. Civ. P. 59.04 motion bringing to the trial court's attention that it had overlooked the $36,500 in loans from Dr. Roth's father, a $2,600 debt to Otolaryncology Associates, and a $800 debt to Vanderbilt University Medical Center. In its February 18, 1998 order, the trial court allocated these debts to Dr. Roth.

Trial courts should allocate the parties' marital debt as part of the division of the marital estate. *Anderton v. Anderton*, 988 S.W.2d at 679. The parties' debt, like their marital property, should be divided equitably in accordance with the factors in Tenn. Code. Ann. § 36-4-121(c) and in light of (1) which party incurred the debt, (2) the purpose of the debt, (3) which party benefitted from incurring the debt, and (4) which party is better able to repay the debt. *Goodman v. Goodman*, 8 S.W.3d 289, 298 (Tenn. Ct. App. 1999); *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 243 (Tenn. Ct. App. 1995). Marital debts need not be divided in precisely the same manner as the marital assets, although, where possible, they frequently follow their related assets. *Kinard v. Kinard*, 986 S.W.2d at 233; *King v. King*, 986 S.W.2d at 219; *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989).

---

[2]Because of its errors with regard to the valuation of the two bank accounts, the trial court overvalued the marital property by $20,628.74. It undervalued the 1997 Dodge Caravan by $4,425. Accordingly, the net overvaluation of the marital property is $20,628.74 - $4,425.00 = $16,203.74.

Dr. Roth obtained the $36,500 in loans from his father to help finance his dental practice. Ms. Roth played no role in obtaining these loans. When Dr. Roth sold his private dental practice, he used the proceeds for marital purposes rather than for repaying his father. Thus, these loans can properly be considered marital because both parties eventually benefitted from them. However, Dr. Roth clearly is in a better position to be able to earn income to repay these loans, at least to the extent that his father required repayment. Accordingly, the trial court did not err in allocating these debts to Dr. Roth.

We reach the same conclusion with regard to the debts to the two healthcare providers. While these debts were incurred in order to provide medical services to Ms. Roth, Dr. Roth is in a better financial position to repay them. In addition, these debts could have been paid from Ms. Roth's $123,000 settlement of her personal injury action. However, these funds ran short when Dr. Roth used part of them to pay his car loan and to purchase an automobile for his son from his first marriage. In light of this evidence, we have no basis for second-guessing the trial court's decision to allocate these debts to Dr. Roth.

### D.
### THE NET DIVISION OF THE MARITAL ESTATE

After correcting the trial court's valuation errors and taking into consideration the retail value of the 1997 Dodge Caravan, we have determined that the aggregate value of the parties' marital property is $320,878.26.[3] Dr. Roth received $134,573.26 (or 42%) of this property; while Ms. Roth received $186,305 (or 58%) of this property. The parties also had $59,500 in marital debts.[4] Of these debts, the trial court allocated $39,900 (or 67%) to Dr. Roth and $19,600 (or 33%) to Ms. Roth. Taking both the marital property and marital debts into consideration, the parties' net estate is valued at $261,378.26. Dr. Roth's share is $94,673.26 (or 36%), and Ms. Roth's share is $166,705 (or 64%).

The parties were married for almost sixteen years. During the marriage, Ms. Roth contributed to the marriage, not only as a wife and mother, but also as a full-time wage earner. Her current financial circumstances are less favorable than they were before her injury in the automobile accident. The effects of her injuries have made it difficult to work full-time, and her inability to work has impaired her ability to acquire capital assets and to earn income. While the $123,000 from the settlement of her personal injury claim could have been a capital asset on which she could have relied in the future, those proceeds were deposited into a joint bank account and were spent by the time of the divorce trial. In fact, Dr. Roth used part of these funds to pay off his car loan and to purchase a car for his son from his first marriage. Considering these facts in light of Tenn. Code Ann. § 36-4-121(c)(1), (2), (4), (5), (8), we have determined that it is equitable to award Dr. Roth

---

[3]$317,482 [the trial court's valuation] - $16,203.74 [net valuation errors] + $19,600 [adjustment for retail value of the 1997 Dodge Caravan] = $320,878.26.

[4]These debts included: $36,500 to Dr. Roth's father, $3,400 in medical bills, and $19,600 for the car loan.

42% of the marital property and require him to pay 67% of the marital debt. Accordingly, we affirm the trial court's division of the parties' marital estate as corrected herein.

## II.
### THE AWARD FOR LONG-TERM SPOUSAL SUPPORT

Dr. Roth also takes issue with the trial court's decision to award Ms. Roth $1,000 per month in long-term spousal support. He asserts that Ms. Roth did not prove that she was incapable of rehabilitation and that the proof indicates that the physical impairment caused by the automobile accident is not as serious as Ms. Roth makes it out to be. We have determined that the evidence supports the trial court's decision to require Dr. Roth to pay Ms. Roth $1,000 per month in long-term spousal support.[5]

### A.

There are no hard and fast rules for spousal support decisions. *Anderton v. Anderton*, 988 S.W.2d at 682; *Crain v. Crain*, 925 S.W.2d 232, 233 (Tenn. Ct. App. 1996); *Stone v. Stone*, 56 Tenn. App. 607, 615-16, 409 S.W.2d 388, 392-93 (1966). Trial courts have broad discretion to determine whether spousal support is needed and, if so, its nature, amount, and duration. *Goodman v. Goodman*, 8 S.W.3d at 293; *Garfinkel v. Garfinkel*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996). Appellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes. *Brown v. Brown*, 913 S.W.2d at 169; *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986).

Tenn. Code Ann. § 36-5-101(d)(1) (Supp.2000) reflects a preference for temporary, rehabilitative spousal support, as opposed to long-term support. *Crabtree v. Crabtree*, 16 S.W.3d 356, 358 (Tenn. 2000); *Goodman v. Goodman*, 8 S.W.3d at 293; *Herrera v. Herrera*, 944 S.W.2d at 387. The purpose of rehabilitative support is to enable the disadvantaged spouse to acquire additional job skills, education, or training that will enable him or her to be more self-sufficient. *Smith v. Smith*, 912 S.W.2d 155, 160 (Tenn. Ct. App. 1995); *Cranford v. Cranford*, 772 S.W.2d 48, 51 (Tenn. Ct. App. 1989). On the other hand, the purpose of long-term spousal support is to provide support to a disadvantaged spouse who is unable to achieve some degree of self-sufficiency. *Loria v. Loria*, 952 S.W.2d 836, 838 (Tenn. Ct. App. 1997). The statutory preference for rehabilitative support does not entirely displace other forms of spousal support when the facts warrant long term or more open-ended support. *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995); *Isbell v. Isbell*, 816 S.W.2d 735, 739 (Tenn. 1991).

---

[5]Dr. Roth has not questioned the trial court's decision to award Ms. Roth $5,000 in alimony in solido and to require him to pay $5,000 of her legal expenses. Therefore, we express no opinion regarding these awards or their effect on Dr. Roth's overall spousal support obligation.

Even though Tenn. Code Ann. § 36-5-101(d)(1)(K) provides that fault is a relevant consideration when setting spousal support, decisions regarding spousal support are not intended to be punitive. *Anderton v. Anderton*, 988 S.W.2d at 682; *Kinard v. Kinard*, 986 S.W.2d at 234. The purpose of spousal support, whether it is called "rehabilitative" or "long-term," is to enable the disadvantaged spouse to become and remain self-sufficient and, when possible, mitigate the harsh economic realities of divorce. In most circumstances, the courts cannot fashion a remedy that enables both spouses to maintain their pre-divorce standard of living because the parties do not have sufficient resources to accomplish this. Thus, the courts will decline to impoverish an obligor spouse in order to enable the disadvantaged spouse to continue to enjoy his or her pre-divorce standard of living. *Goodman v. Goodman*, 8 S.W.3d at 295-96; *Brown v. Brown*, 913 S.W.2d at 169-70.

Decisions regarding the entitlement to spousal support, as well as the amount and duration of spousal support, hinge on the unique facts of each case and require a careful balancing of many factors, including the factors identified in Tenn. Code Ann. § 36-5-101(d)(1). *Watters v. Watters*, 22 S.W.3d 817, 821 (Tenn. Ct. App. 1999); *Hawkins v. Hawkins*, 883 S.W.2d 622, 625 (Tenn. Ct. App. 1994). Among these factors, the two considered most important are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Anderton v. Anderton*, 988 S.W.2d at 683; *Lindsey v. Lindsey*, 976 S.W.2d 175, 179 (Tenn. Ct. App. 1997); *Umstot v. Umstot*, 968 S.W.2d 819, 823 (Tenn. Ct. App. 1997). Of these two factors, the disadvantaged spouse's need is the threshold consideration. *Aaron v. Aaron*, 909 S.W.2d at 410; *Watters v. Watters*, 22 S.W.3d at 821.

**B.**

Ms. Roth is currently forty-seven years old. She holds a masters degree in nursing, and she worked full-time throughout most of the marriage prior to the auto accident. Were it not for her injuries, she would be able to earn $30,000 per year. However, she asserts that the injuries sustained in the 1989 collision have rendered her unable to work full-time because working in a clinical environment or teaching nursing would require her to be able to lift and transfer patients and to be on her feet all day. Thus, in 1996, she was able to earn only $13,259 working two days a week at Cumberland University.

Dr. Roth asserts that Ms. Roth is overstating the effect of her injuries on her ability to work full-time because she has been able to snow ski and play tennis following the collision. While Ms. Roth concedes that she has attempted to engage in these activities, she states that her pain inhibits her ability to ski and has forced her to quit playing tennis. She also stated that her condition is not expected to improve. The trial court observed Ms. Roth's testimony regarding the effect of her injuries on her ability to work full-time. Even in the absence of corroborating medical evidence, the trial court chose to accredit Ms. Roth's testimony, and we have no basis to second-guess this decision. Accordingly, for the purpose of this appeal, we accredit the trial court's determination that Ms. Roth's physical condition impairs her from working full-time.

In her current circumstances, Ms. Roth is clearly economically disadvantaged when compared to Dr. Roth. Her part-time income cannot match Dr. Roth's income, and thus she will consistently lag behind his ability to support himself and accumulate capital assets for the future. In addition, her ability to work outside the home is somewhat circumscribed because she received custody of the parties' children. Thus, it is evident that Ms. Roth will be unable to approach her pre-divorce standard of living if she is forced to rely upon her part-time salary as her sole means of support. Based on the length of the marriage, the manner in which the trial court divided the marital estate, Ms. Roth's physical condition, the fact that she received custody of the parties' children, her monetary and non-monetary contributions to the marriage, the standard of living the parties established during the marriage, Dr. Roth's responsibility for precipitating the demise of the marriage, and Dr. Roth's ability to pay spousal support, we have concluded that the trial court did not err by deciding to award Ms. Roth "closing in money"[6] in the amount of $1,000 per month.

## III.

We affirm the final divorce decree as modified by this opinion and remand the case to the trial court for whatever further proceedings may be required. We tax the costs of this appeal to Richard Daniel Roth and his surety for which execution, if necessary, may issue.

---

_____
WILLIAM C. KOCH, JR., JUDGE

---

[6]*Aaron v. Aaron*, 909 S.W.2d at 411.