JAN MILTON HAUSMANN,               )
                                   )
        Plaintiff/Appellant,       )
                                   )    Appeal No.
                                   )    01-A-01-9702-CH-00092
                                   )
                                   )    Maury Chancery
NINA LOUISE STANFORD               )    No. 93-381
HAUSMANN,                          )
                                   )
        Defendant/Appellee.        )

FILED

October 29, 1997

Cecil W. Crowson
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE

APPEALED FROM THE CHANCERY COURT OF MAURY COUNTY
AT COLUMBIA, TENNESSEE

THE HONORABLE JIM T. HAMILTON, JUDGE

EDWARD J. GROSS
Suite 1601, Parkway Towers
Nashville, Tennessee 37219
        Attorney for Plaintiff/Appellant

J. RUSSELL PARKES
102 West 7th Street
P. O. Box 692
Columbia, Tennessee 38402-0692
        Attorney for Defendant/Appellee

AFFIRMED IN PART;  MODIFIED IN PART;
AND REMANDED

BEN H. CANTRELL, JUDGE

CONCUR:
TODD, P.J., M.S.
KOCH, J.

# O P I N I O N

The trial court granted the wife a divorce after a marriage of twenty-eight years, and divided the marital property, including the marital home, between the parties. In addition, the husband was ordered to pay the wife $5,000 per month as alimony in futuro, and her attorney fees of $9,645.80. We modify the division of the marital property to grant the wife an undivided interest in the marital home. We also reduce the alimony award to $2,500 per month. In all other respects, we affirm the trial court.

## I. Marriage and Divorce

Jan Milton Hausmann and Nina Louise Stanford married in 1967, when he was working on his masters degree in physiology, and she was a nursing school student. Mrs. Hausmann obtained her R.N. degree about three months after the marriage. Her husband obtained his masters degree, and began medical school in 1968.

During Dr. Hausmann's medical training, his wife worked to support the family. She continued to be the primary wage earner until the parties' youngest child was born in 1972. Thereafter, with her husband's encouragement, Mrs. Hausmann stayed home to raise the parties' three children, while he acted as the family's breadwinner.

In 1976, the parties settled in Columbia, where Mrs. Hausman had grown up, and where her parents still lived. Dr. Hausman joined a Columbia internal medicine practice with three other physicians. The wife's parents gave her a fifty acre tract of land that adjoined their own property. The parties built a six-bedroom, four-and-a-half bath house on the land.

Dr. Hausman discovered that medical practice was not as lucrative as he had hoped, and by his own testimony, he often found it difficult to pay his professional and personal bills. Additionally, the long hours required by a general practice prevented him from participating in his children's upbringing to the degree that he wished.

At some point, the relationship between Dr. Hausman and his wife began to deteriorate. Dr. Hausman dates their problems to the parties' thirteenth wedding anniversary in 1980. On that date, Dr. Hausman was out with his son, and returned home one hour late for a planned celebration in Nashville. His wife was furious, refused to go out with him, and went to bed.

Communication continued to worsen between Dr. Hausmann and his wife, and in 1985, during a time that he characterizes as a period of crisis, he became infatuated with the wife of the minister at the parties' church, and recorded his feelings in a calendar that he used as a journal. Mrs. Hausmann read the calendar and became jealous, leading to many arguments.

In one incident, the Hausmanns were lying in bed, discussing the situation, and Mrs. Hausmann became so angry that she started kicking her husband. He jumped out of bed and grabbed her ankles, pulling her onto the floor. He immediately apologized, but the damage was already done. Mrs. Hausmann was subsequently diagnosed with a compression fracture of the thoracic spine. In 1986, Dr. Hausman suffered a nervous breakdown, requiring counseling and medication.

By 1988 or 1989, Dr. Hausman's practice in Columbia had matured, but it was still not producing the income required by his family, and he was working part-time in the emergency room in order to make ends meet. He decided, with his wife's

concurrence, that he should make a change. In 1991, he purchased a medical practice for $250,000 from a retiring Nashville physician.

It appeared at first that St. Thomas Hospital was willing to guarantee the loan Dr. Hausmann needed to complete the purchase, making collateral unnecessary. But St. Thomas ultimately declined, so the house and land in Columbia had to be pledged as collateral to secure the loan. Dr. Hausmann found his new practice to be less stressful than the old one, even though he had to commute from his home in Columbia to Nashville four days a week.

However the change in practice did not repair the relationship between the parties. In 1992, Mrs. Hausmann had an argument with her son, who was a medical student at the time. The upshot of the argument was that the son would no longer be receiving financial help from his mother, as she wanted to preserve her inheritance, and that Dr. Hausmann would henceforth have to pay all the son's expenses. Dr. Hausmann established an account in Nashville for that purpose. When Mrs. Hausmann found out about the account, she called her husband deceitful, because he had opened the account in his own name without telling her about it.

Dr. Hausmann testified that his wife was subject to repeated episodes of irrational behavior, furious outbursts in which she insulted and belittled him. Mrs. Hausmann admitted that she often acted unreasonably out of anger, and that it took her a long time to get over her feelings. But she testified that she eventually did get over them, and she faulted her husband for failing to let go of his resentment over her behavior.

Dr. Hausmann left the marital home in December of 1992, following an incident in which his wife refused to go out on a planned dinner and movie date with him when he returned from work later than the parties anticipated. Dr. Hausman

moved to Nashville, where he rented a small apartment, and he voluntarily started paying his wife $4,325 per month to cover her expenses.

Dr. Hausmann had a first cousin in Texas, Ann McEnroe, whom he had been very close to when they were growing up. At some point, he began communicating with her by telephone, and found her to have a sympathetic ear. Mrs. McEnroe's husband grew suspicious because of the frequent and lengthy phone calls, and because Dr. Hausmann sent her gifts of flowers. Apparently, Mr. McEnroe tapped the phone at one point, but at trial he invoked his privilege against self-incrimination, and declined to testify about the phone tap. In any case, he telephoned Mrs. Hausmann to tell her of his suspicions.

In May of 1993, Dr. Hausmann travelled to San Antonio, ostensibly to see his father and stepmother, but at least in part to see Mrs. McEnroe. Though the parties had separated by then, Mrs. Hausmann was still getting calls at home from her husband's patients, and Dr. Hausmann felt he had to let her know his whereabouts so she could respond to questions from them. He therefore told her about his upcoming trip. Unbeknownst to him, she also travelled to Texas, accompanied by two private investigators.

They followed Dr. Hausmann and Mrs. McEnroe from Friday night to Sunday afternoon, when the two drove from San Antonio to Kerrville and back. They observed the two cousins stopping at roadside parks to pick flowers and embrace, and pulling into a cul-de-sac near Dr. Hausmann's father's house, so they could embrace and kiss. At trial, Dr. Hausmann admitted embracing and kissing his cousin, but denied that they had engaged in sexual acts.

On July 12, 1993, Dr. Hausmann filed for a divorce on the ground of irreconcilable differences. On August 27, 1993, his wife answered, and counter-claimed for divorce, on the ground of adultery.

After considering all the evidence, the trial court concluded: "[i]t appeared to the court that the Defendant (sic), Dr. Jan Milton Hausman, has been guilty of adultery, and the Defendant, Nina Louise Stanford Hausmann, is entitled to an absolute divorce from the Plaintiff." Dr. Hausmann subsequently appealed.

## II.  Absolute Divorce

The appellant argues that although Dr. Hausmann may have been guilty of bad judgment in visiting Mrs. McEnroe so soon after the parties' separation, there was no proof that he had committed adultery. It is true that there is no direct evidence of adulterous acts in the record, but there is uncontroverted proof from which a trier of fact might reasonably infer that such acts had been committed. Adultery may be established by circumstantial evidence, and need not be proven beyond a reasonable doubt. *Sutton v. Sutton*, 3 Tenn. App. 333 (1926); *Trout v. Trout*, 250 S.W.2d 372, 35 Tenn. App. 617 (1952); *Gilliam v. Gilliam*, 776 S.W.2d 81 (1988).

We must state at the outset that we do not find any significant evidence in the record to indicate an adulterous relationship between Dr. Hausmann and the minister's wife. The only evidence conceivably sufficient to support the trial court's finding involves Dr. Hausmann's cousin.

The evidence includes Dr. Hausmann's admission that he spent two nights in the same house with Mrs. McEnroe, a photograph of Dr. Hausmann and his cousin with their arms around each other, and his admission that he kissed her on the lips. He also admitted that he had discussed with Mrs. McEnroe the propriety of first

cousins marrying. Balanced against that evidence is Dr. Hausmann's denial that he had any romantic interest or feelings for Ann McEnroe.

A finding of fact by the trial court in a civil action is accompanied on appeal by a presumption of the correctness of that finding. An appeals court may not set such a finding aside unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). The trial court is entitled to this presumption, because as the trier of fact, the trial judge observes the witnesses on the stand, and is thus in a better position than is the appeals court to assess their credibility. *Harwell v. Harwell*, 612 S.W.2d 182 (Tenn. App. 1980).

After thoroughly reviewing this record, we do not believe that it conclusively proves that the appellant has been guilty of adultery. But neither can we say that the evidence preponderates against the trial court's finding.

Adultery has, of course, long been recognized as a ground for divorce. See Tenn. Code Ann. § 36-4-101. The fact that the alleged adultery may have occurred after the parties separated does not prevent the trial court from granting one party a divorce on the basis of the other party's adultery. *Clark v. Clark*, 644 S.W.2d 681 (Tenn. App. 1981); *Perry v. Perry,* 765 S.W.2d 776 (Tenn. App. 1988). We do not find any error in the court's decision to grant the wife an absolute divorce on the basis of the husband's adultery.

### III.  The Marital Home

The issues of the disposition of the marital home and the award of alimony are closely intertwined in this case. To the degree that the alimony award was based upon the appellee's need, a prime consideration in establishing that need

appears to have been the cost of her continued occupation of the 6,000 square foot home that the parties shared during their marriage. Nonetheless, for the sake of clarity, we will discuss the two issues separately.

As mentioned earlier, the parties' marital home was built on a fifty acre tract that was given to Mrs. Hausmann by her parents. An inheritance from Mrs. Hausman's aunt enabled her to build a porch and entranceway onto the home. Another inheritance from an uncle, and further financial gifts from her parents underwrote additional improvements to the home and its furnishings.

The trial court granted the appellee the use and occupancy of the marital home, but ordered that if she remarried, the house would be sold, and the appellant would be entitled to half the proceeds, minus the appraised value of the fifty acres at the time of sale, and also minus the $50,000 of inherited money that Mrs. Hausmann had put into the residence. If the appellee chose to sell the home at any time, Dr. Hausmann would likewise be entitled to the same portion of the equity as he would upon her remarriage.

We believe that several purposes are served by a judicial division of marital property incident to divorce. One obvious purpose is to give each party an equitable portion of the property that was accumulated by the efforts and contributions of both parties. Another is to provide each of the parties with sufficient property to meet that party's future needs. See Tenn. Code Ann. § 36-4-121.

Yet another purpose is to allow the parties to disentangle their financial affairs, so that each may get on with his or her own life without unnecessary involvement of the other. This purpose is more easily achieved in cases like the present one, where the necessary involvement between the parties is reduced because no minor children are involved.

We do not believe that the trial court's division of the equity in the home serves any of the above purposes. While both parties contributed substantially to the construction and maintenance of the home, and the husband therefore has a theoretical right to a share in the equity, the economic benefit to him of the conditional right to receive that equity is minimal, and the requirement that the wife sell the home if she remarries is an unnecessary intrusion on her freedom.

The trial court correctly recognized that it is appropriate to allow the wife to continue to live in the home, if she is able to do so. She wishes to maintain her emotional ties to the house and to the Columbia community, while the husband now lives and works in Nashville. We also find no fault with the court's reasoning that she would be entitled to the larger share of the equity in the home if it were sold, because of the contributions of her relatives.

The husband has been granted the undivided right to his medical practice, which in his hands is a productive asset. The house cannot be considered a productive asset, but it is by far the most valuable property the parties accumulated during their marriage. (The trial court found the home and fifty acres to be worth $350,000, and the medical practice to be worth $50,000). It is clear that by granting the wife undivided title to the marital home, she is getting a far larger share of the marital assets than is the husband. But we believe that such a division is equitable, in accordance with the factors set out in Tenn. Code Ann. § 36-4-121(c) for the division of marital property, especially factor (4) "the relative ability of each party for future acquisition of capital assets and income."

One problem involved in divesting the husband of his interest is that the remaining $185,000 balance on the loan the husband used to purchase the Nashville practice is collateralized by the equity in the house and land. Until that loan is paid by the husband it will remain a restraint on the wife's ability to sell the property. The

trial judge did not deal with that problem and the parties have not raised it on appeal, so we will not attempt to resolve it here except to point out that the obligation belongs exclusively to the husband and the wife is entitled to indemnification for any losses that result from the husband's loan.

On balance, this court is of the opinion that granting the wife the marital home is the course best calculated to give each of the parties the freedom to live their lives without unwelcome involvement of the other.

## IV. Alimony

In Tenn. Code Ann. § 36-5-101(d) the legislature sets out an exhaustive list of factors for the court to consider in determining the appropriate level of support and maintenance for an obligor spouse to pay. There is no need to copy the entire list verbatim in this opinion, but we note that some of the factors that support the right of Mrs. Hausman to receive substantial alimony from her former husband are the duration of the marriage, the age and physical condition of the parties, the relative earning capacity of the parties, and the standard of living established by the parties during their marriage.

Mrs. Hausmann was fifty years old at the time of trial. Though she has an R.N. degree, she no longer has an active nursing license. To obtain such a license at this point would require several years of additional study. Further, she suffers from rheumatoid arthritis, and a compression fracture of the spine, and would not be able to perform many of the functions traditionally associated with the nursing profession, without suffering severe pain. Since the separation from her husband, she has been working two days a week at a church daycare center, and earning $300 per month.

The appellant argues that because of her prior training as a nurse, Mrs. Hausmann would be an appropriate candidate for rehabilitative alimony rather than permanent alimony. Though we do not find it inconceivable that she might obtain gainful employment in some field that would enable her to bypass her physical limitations, we believe that the evidence supports the trial court's determination that she should receive alimony in futuro, until her death or remarriage.

We also believe, however, that the evidence preponderates against an award of $5,000 per month. In setting the amount of alimony, the most important factors are the obligee's need and the obligor's ability to pay. See *Loyd v. Loyd,* 860 S.W.2d 409, 412 (Tenn. App. 1993); *Lancaster v. Lancaster*, 671 S.W.2d 501, 503 (Tenn. App. 1984). Another important factor in some cases is the relative fault of the parties. We will examine each of these factors in turn.

### a. Need

The wife filed a Sworn Statement of Income and Expenses, indicating total monthly expenses of about $4,000. Of that amount, expenses on the house amounted to almost $2,000. Mortgage payments on the $355,000 house were only $607 per month, but insurance and taxes were listed as costing $303 per month, utilities, $608 per month, and maintenance, $400 per month. Other items in the category of general expenses were car payment, gas, oil, repairs and insurance, $470 per month, and "other," $204 per month.

The larger items in the $1,290 category of personal expenses included food at $300 per month, clothing at $200 per month and "Miscellaneous (Contributions & Gifts)" at $400 per month. The wife indicated that she needed $5,000 per month in order to net the $4,000 after taxes that she required to meet her monthly expenses.

As mentioned above, the need of the obligee is a prime factor to consider in setting alimony, and the court is directed by statute to consider the standard of living the parties enjoyed during their marriage. Unfortunately, it may not be possible to maintain the marital living standard if the same income that previously only supported one household is now called upon to support two.

**b. Ability to Pay**

When he was still practicing in Columbia, Dr. Hausmann created a Professional Corporation for liability and tax purposes. The proof shows that on April 1, 1994, Dr. Hausmann (or his P.C.) entered into a management services agreement with St. Thomas Hospital. By the terms of that agreement, St. Thomas pays the overhead expenses of Dr. Hausmann's practice in exchange for 50% of his gross receipts. We note that there is testimony in the record that it is not at all unusual for overhead to consume 50% or more of the revenue produced by a general medical practice.

Unfortunately, a copy of the contract has not been made a part of the record, which makes it difficult for us to evaluate other testimony to the effect that there are some overhead items that are not covered by the contract, and that the appellant must reimburse St. Thomas for overhead expenses it pays in excess of 50% of gross receipts. Two things that are clear from the record are that Dr. Hausmann's salary is paid from that half of his receipts that are left over after St. Thomas has been paid, and that the $1,917 monthly payment on the debt from his purchase of Dr. Foreman's practice is not covered by the contract.

In 1992 (the first full year in which Dr. Hausmann engaged in his new Nashville practice) he had gross receipts of $308,000. In 1993 the gross amounted to $325,000. In 1994 his gross receipts amounted to $251,000. The decline in

receipts was attributed in part to changing rules of Medicare reimbursement and in part to stress over the divorce. We find it reasonable to assume, therefore, that in the last year for which we have records, the appellant's personal income amounted to no more than $125,500, before income taxes and corporate taxes, and perhaps somewhat less.

Dr. Hausmann's own income and expense statement only lists the income he receives from his $6,500 monthly salary, and not the profits from his personal corporation. We therefore do not find credible his assertion that his obligations to his wife and to the bank consume virtually his entire income, forcing him to live solely on the good graces of his creditors.

The expense side of his statement indicates total monthly expenses of $3,334. Of that amount, over $1,500 is allocated to insurance expenses (including insurance for the wife). There was testimony that some of the insurance obligations were paid out of the professional corporation's account, and an implication that some may have actually been included in the overhead paid by St. Thomas.

Despite the deficiencies and ambiguities in his income and expense statement, it is clear that Dr. Hausman is maintaining a far more modest life style than is his former wife, particularly in view of the fact that he resides in a rented two room apartment and drives a ten year old station wagon.

We believe that we can fairly infer from the record that on his current income, Dr. Hausmann would be unable to pay $5,000 per month in alimony (or $60,000 a year), remain current on his monthly debt payments of $1,917 (or $22,004 a year), and maintain a reasonable standard of living for himself in Nashville.

The appellee argues that Dr. Hausmann could earn more money if he started working part-time in the emergency room again, as he did previously, and the trial court found that Dr. Hausmann ". . . has an unlimited earning capacity, having practiced medicine for in excess if twenty (20) years." However, we do not believe that Dr. Hausman's income is as elastic as the trial court indicates.

To the contrary, we believe that Dr. Hausmann's experience has amply demonstrated that while physicians are well compensated, there are limits to what they can earn, and in particular, limits on what he himself is capable of earning. Dr. Hausman has testified that over half his current patients are on Medicare, so his income may be further constrained by future changes in Medicare compensation rates.

### c. Fault

The trial court refers to the wife in its final order as "the innocent spouse." Elsewhere in the order he says "the proof is clear the Plaintiff destroyed this marriage" and in another place "[t]his divorce was caused by the misconduct of the Plaintiff." It is thus reasonable for us to infer that the question of fault weighed heavily in the trial court's decision to grant the appellee alimony of $5,000 per month.

While Tenn. Code Ann. § 36-5-101(d) permits the trial court to consider the relative fault of the parties in setting an alimony award, spousal support awards are not intended to be punitive, nor is fault permitted to override the other factors the court is directed to consider by Tenn. Code Ann. § 36-5-101(d). *Brown v. Brown*, 913 S.W.2d 163 (Tenn. App. 1994).

In any case, after thoroughly reading the transcript of evidence, including the direct and cross-examination of the parties, we believe that both parties must bear

some responsibility for the break-up of this marriage. Though the trial court granted the wife the divorce, the alleged adultery of the husband occurred after the relationship of the parties was already beyond repair, due to the failure of each party to extend to the other that degree of affection and support necessary to maintain the bonds of matrimony.

We are therefore of the opinion that the husband's alimony obligation should be reduced to $2,500 per month. The duration of the obligation is to remain until the wife's death or remarriage. Of course, if there is a significant and material change of circumstances, such as a substantial change in the income of either party, the support obligation may be amended upon the filing of a petition for modification of alimony.

## V. Attorney Fees

The trial court ordered Dr. Hausmann to pay $9,645 of the attorney fees incurred by Mrs. Hausmann. An award of attorney fees in a divorce case is considered to be a form of alimony in solido. *Raskind v. Raskind* 45 Tenn. App. 583, 325 S.W.2d 617 (1959); *Storey v. Storey*, 835 S.W.2d 593 (Tenn. App. 1992). The trial court is vested with wide discretion in awarding attorney fees, and will not be reversed, absence abuse of that discretion. *Elliot v. Elliot*, 825 S.W.2d 87 (Tenn. App. 1991). We do not find any such abuse of discretion in this case.

## VI.

The order of the trial court is affirmed in part and modified in part. Remand this cause to the Chancery Court of Maury County for further proceedings consistent with this opinion. Tax the costs on appeal equally to both parties.

_____
BEN H. CANTRELL, JUDGE


CONCUR:




_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION




_____
WILLIAM C. KOCH, JR., JUDGE