# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 26, 2002 Session

## SHERRY MAE HOPKINS v. JAMES FRANKLIN HOPKINS

**Appeal from the Circuit Court for Sevier County**
**No. 2000-472-1     Ben W. Hooper, II, Judge**

### FILED OCTOBER 23, 2002

### No. E2001-02849-COA-R3-CV

---

In this appeal from the Circuit Court for Sevier County the Appellant, James Franklin Hopkins questions whether the Trial Court erred in awarding alimony to the Appellee, Sherry Mae Hopkins, and in ordering that all of Ms. Hopkins' debts be paid out of proceeds from the sale of the marital residence.  Mr. Hopkins also asserts that Ms. Hopkins unlawfully disposed of marital assets.  We affirm in part and modify in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Modified in Part; Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

Scarlett Allen Beaty, Knoxville, Tennessee, for the Appellant, James Franklin Hopkins

Rebecca Denise Slone, Dandridge, Tennessee, for the Appellee, Sherry Mae Hopkins

#### OPINION

In this appeal from the Circuit Court for Sevier County the Appellant, James Franklin Hopkins, raises three issues which we restate as follows:

1. Did the Trial Court err in its award of alimony to the Appellee, Sherry Mae Hopkins?

2. Did the Trial Court err in ordering that all marital debts be paid from proceeds from the sale of the parties residence?

3. Did Ms. Hopkins dispose of marital assets in violation of T.C.A. 36-4-106(d)?

Our review of a case such as this one is *de novo* upon the trial court record with a presumption that the Trial Court's factual findings are correct absent a preponderance of evidence

to the contrary. Tenn.R.App.P. 13(d). There is no presumption of correctness as to the Trial Court's conclusions of law. *Campbell v. Florida Steel.*, 919 S.W.2d 26 (Tenn. 1996).

The parties in this matter separated on June 18, 2000, and Ms. Hopkins filed a complaint for divorce in the Sevier County Circuit Court on June 19, 2000, and amendment thereto on December 13, 2000. Trial was held on May 14, 2001, and, by final decree entered June 14, 2001, the Trial Court ordered as follows:

1. The wife is awarded an absolute divorce on the grounds of inappropriate marital conduct.

2. The Court awards the hay elevator to the wife and the husband's interest is divested. Otherwise each party is awarded that personal property in his or her possession and the other party's interest is divested. The Court finds this division to be fair and equitable.

3. All debts of the parties with balances as of June 18, 2000, including the wife's Kia, shall be paid from the sole proceeds of the marital residence. After said date, each party shall be responsible for his or her own indebtedness and shall hold the other harmless thereon.

4. The wife is awarded one-half of the husband's retirement/pension benefits up to the date of trial of May 14, 2001 and a Qualified Domestic Relations Order shall be submitted for disbursement of this asset.

5. Each party shall retain his or her own savings accounts. The husband shall be awarded his Edward Jones Investment Account as his separate property from a worker's compensation settlement.

6. Each party shall pay his or her own attorney's fees and Court costs shall be paid from the proceeds from the sale of the marital residence.

7. The wife is awarded alimony in the amount of $600.00 per month until death, remarriage, or cohabitation with someone of the opposite sex.

Upon motion of Mr. Hopkins, the Court amended the final decree by order entered October 11, 2001, to also award Mr. Hopkins one-half of Ms. Hopkins' retirement accumulated as of May 14, 2000.

The first issue we address is whether the Trial Court erred in awarding Ms. Hopkins alimony *in futuro* in the amount of $600.00 per month until death, remarriage or cohabitation. Mr. Hopkins argues that Ms. Hopkins should receive no alimony in this case. Alternatively, Mr. Hopkins contends that Ms. Hopkins should receive no more than $200.00 to $300.00 for a few months. Mr.

Hopkins asserts that the Trial Court referred to only one factor - the discrepancy in the parties' salaries - in justification of its award of alimony. Mr. Hopkins further asserts that the Trial Court also failed to make a determination that Ms. Hopkins is in need of rehabilitation or that rehabilitation is feasible before awarding her alimony *in futuro*.

T.C.A. 36-5-101(d)(1) provides that, in determining whether payment of spousal support is proper and in determining the proper form and amount of such support, a trial court should consider all relevant factors including the following:

> (A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;
> (C) The duration of the marriage;
> (D) The age and mental condition of each party;
> (E) The physical condition of each party; including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
> (F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;
> (G) The separate assets of each party, both real and personal, tangible and intangible;
> (H) The provisions made with regard to the marital property as defined in § 36-4-121;
> (I) The standard of living of the parties established during the marriage;
> (J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
> (K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and
> (L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

This Court has noted on prior occasion that, while all of the above factors must be considered in arriving at a decision regarding spousal support, "the two most important factors are the demonstrated need of the disadvantaged spouse and the obligor spouse's ability to pay." *Anderton v. Anderton*, 988 SW2d 675 (Tenn. Ct. App. 1998).

The legislature of this State has heretofore indicated its preference for rehabilitative alimony when one spouse is found to be economically disadvantaged. As provided at T.C.A. 36-5-101(d)(1):

> It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3).

A trial court may not order alimony *in futuro* unless it has made the threshold determination that, considering all relevant factors, rehabilitation of the economically disadvantaged spouse is not feasible. *Storey v. Storey*, 835 SW2d 593 (Tenn. Ct. App. 1992). Although the record does not specifically show that the Trial Court found that rehabilitation of Ms. Hopkins is not feasible, such finding is implicit in the Trial Court's award of alimony *in futuro*. We must ascertain whether the evidence presented supports that finding considering all relevant factors set forth at T.C.A. 36-5-101(d)(1). *Robertson v. Robertson*, 76 S.W.3d 337 (Tenn. 2002). In so doing, we bear in mind that a trial court is accorded wide discretion in determining whether an award of alimony should be rehabilitative or *in futuro*. *Crabtree v. Crabtree*, 16 S.W.3d 356 (Tenn. 2000).

With respect to T.C.A. 36-5-101(d)(1)(A) we note as follows. Ms. Hopkins receives approximately $32,000.00 in annual compensation as a rural mail carrier for the U.S. Postal Service while Mr. Hopkins receives a significantly larger salary, in the amount of $61,000.00, as a certified and licensed truck driver. No proof was presented as to the projected future earning potential of either party in their current positions of employment. As set forth above, the Trial Court decreed that all debts of the parties as of June 18, 2000, were to be paid from the proceeds realized from sale of the marital residence. After subtracting these debts from the list of average monthly expenses filed by Ms. Hopkins on May 14, 2001, we find that Ms. Hopkins still incurs the following expenses:

| | |
|---|---|
| Rent | $ 350.00 |
| Gas | 40.00 |
| Electric | 60.00 |
| Car Insurance | 57.50 |
| Phone | 60.00 |
| Cellular Phone | 100.00 |
| Medications | 50.00 |
| Chiropractor | 100.00 |
| Other medical | 100.00 |
| Groceries | 300.00 |

| | |
|---|---|
| Gas (automobile)[1] | 500.00 |
| Church | 200.00 |
| Horse feed | 80.00 |
| Vet bills | 150.00 |
| Clothing | 200.00 |
| Insurance | 80.00 |
| | |
| TOTAL | $2,427.50 |

Ms. Hopkins' total annual compensation of $32,000.00 consists in part of benefits in the amount of $6,665.38 extended to her by her employer and represent coverage of certain health benefits, basic life insurance, retirement plan, social security and medicare. This $6,665.38 is apparently the value placed on these benefits by Ms. Hopkins' employer and does not represent money which is available to Ms. Hopkins. The record shows that Ms. Hopkins' actual gross salary is $25,350.03 or $2,112.50 per month. Ms. Hopkins testified that she will receive an initial raise of forty cents an hour after she has been employed for a period of ninety-six weeks.[2]

We do not find an itemized list of Mr. Hopkins' monthly expenses in the record, although he testified at trial that he pays rent in the amount of $425.00, utilities in the amount of $25.00 to $50.00 and a car payment in the amount of $143.00. Mr. Hopkins further testified that he incurs road expenses related to his work in the amount of $60.00 to $70.00 per week for food, a percentage of which he deducts as a business expense on his tax return. He also testified that he incurs expenses for laundry, phone, and clothing in unspecified amounts and a life insurance premium in the amount of $83.00 a quarter. Mr. Hopkins presents no proof that his monthly expenses meet or exceed those of Ms. Hopkins. Mr. Hopkins' Form W-2 wage and tax statement shows that his gross salary for the year 2000 was $61,318.08 or $5,109.84 per month.

As to T.C.A. 36-5-101(d)(1)(B) the record shows that both parties have twelve years of education. Mr. Hopkins has certification as a truck driver and has been employed in that capacity for many years. Ms. Hopkins worked for the Postal Service on a part time basis for six years prior to her divorce and at the time of divorce Ms. Hopkins had worked full time for the Postal Service for more than a year.

With respect to T.C.A. 36-5-101(d)(1)(C), as previously noted, the duration of this marriage was thirty years.

---

[1]Ms. Hopkins is required to use her own vehicle in her job as mail carrier. The KIA automobile purchased shortly before her separation from Mr. Hopkins had already accumulated 31,000 miles by the time of trial according to Ms. Hopkins' testimony.

[2]Ms. Hopkins testified that she had been told that her salary would be diminished by $3,000.00 in th upcoming year. The Trial Court overruled a hearsay objection to this testimony. Ms. Hopkins subsequent testimony reveals that she has never received any written formal notice of this proposed wage decrease.

With respect to T.C.A. 36-5-101(d)(1)(D), we note that both parties were forty six years old at the time of the divorce. There was no proof submitted as to the mental condition of the parties.

With respect to T.C.A. 36-5-101(d)(1)(E) we note that each party has had some physical problems. Mr. Hopkins sustained an on-the-job back injury in 1999 which left him with a twenty percent permanent disability. Ms. Hopkins underwent surgery for cervical cancer shortly before separating and will require medication for the remainder of her life as a consequence. She also testified that she must take medications for the rest of her life for a thyroid condition and for the effects of carbon monoxide poisoning. Neither party offered evidence that their physical problems impair their ability to earn a living.

There were no minor children at the time of divorce and, accordingly, T.C.A. 36-5-101(d)(1)(F) is not a relevant factor in this case.

With respect to T.C.A. 36-5-101(d)(1)(G), we note that the Trial Court decreed that Mr. Hopkins be awarded as his separate property an Edward Jones Account containing $18,000.00 representing funds remaining from the settlement of a worker's compensation claim related to the back injury suffered by Mr. Hopkins in 1999. The Court did not specifically designate any other property awarded to either party as that party's separate property, although the Court referred to the KIA automobile acquired by Ms. Hopkins shortly before separation, and awarded to her, as "the wife's KIA". The value of the KIA is approximately $14,000.00. Mr. Hopkins was additionally awarded funds contained in two individual savings accounts in his name which contained a total of $1,676.29 according to filed statements. Mr. Hopkins was also awarded vehicles in his possession consisting of an encumbered Bronco valued by Ms. Hopkins at $2,500.00, an unencumbered pick-up truck valued by Ms. Hopkins at $8,500.00, a dump truck which Mr. Hopkins testifies belongs to his mother and a motorcycle which Mr. Hopkins testifies belongs to his brother. The Trial Court made no finding as to the ownership of these latter two vehicles.

With respect to T.C.A. 36-5-101(d)(1)(H), as set forth in the Trial Court's final decree and amendment thereto, each party was awarded the personal property in his or her possession except for a hay elevator which was in Mr. Hopkins' possession and was awarded to Ms. Hopkins. Each party was also awarded one-half of the other's retirement/pension benefits. Although the Trial Court assigned no specific value to the parties' pension/retirement benefits Ms. Hopkins testified that she had accumulated approximately $2,400.00 of such benefits at the time of divorce and that Mr. Hopkins had been developing his pension plan for approximately ten years. Finally, the Court ordered that the $82,000.00 realized from the pre-divorce sale of the Parties' residence be used to pay "all of debts of the parties with balances as of June 18, 2000, including the wife's KIA." After payment of all these debts the balance remaining was divided equally between the parties.

As to T.C.A. 36-5-101(d)(1)(I), there was little evidence presented regarding the standard of living established by the parties during the marriage. Ms. Hopkins testified that she now lives in a small rented house with no closet space; however, we find no evidence as to the characteristics of the marital residence by which we might compare it to her current residence. Ms. Hopkins testified

that she no longer has a barn for her horse as she did when she was married, although she still has pasture land.

With regards to T.C.A.36-5-101(d)(1)(J), we find that, while the marriage was supported financially by Mr. Hopkins, Ms. Hopkins made equivalent contribution to the marriage by taking care of the home and raising the parties' two children. There is no evidence that either party's contribution to the marriage exceeded that of the other.

With respect to T.C.A.36-5-101(d)(1)(K), although the divorce was awarded to Ms. Hopkins the record does not support a finding that Mr. Hopkins' fault in this marriage was sufficient to influence our determination of spousal support.

After careful analysis of the circumstances in this case we find that Ms. Hopkins is economically disadvantaged. There is a preponderance of evidence that Ms. Hopkins is in need of some alimony which Mr. Hopkins has the ability to pay. At the same time, we do not agree that *in futuro* alimony is appropriate in this case and it is our determination that the evidence preponderates against the implicit finding of the Trial Court that rehabilitation of Ms. Hopkins is not feasible. She has been employed in a secure job for over a year, she is able to earn gross wages in excess of $2,000.00 per month and she receives additional annual compensation of $6,665.38 in the form of paid benefits. Neither Ms. Hopkins' age nor state of health convince us that she will not be able to enjoy her current position of employment for many more years should she choose to do so. In view of our findings we reverse the Trial Court's award of alimony *in futuro* and award Ms. Hopkins rehabilitative alimony in the amount of $600.00 per month for four years. Such an award is in keeping with the purpose of rehabilitative alimony as recently described by the Tennessee Supreme Court in *Robertson v. Robertson*, 76 S.W.3d 337 (Tenn. 2002) at page 340-341:

> ...[R]ehabilitative alimony may assist the disadvantaged spouse in obtaining further education or training. (citations omitted). "Rehabilitative alimony serves to support an economically dependent spouse 'through a limited period of re-education or retraining following divorce, thereby creating incentive and opportunity for that spouse to become self-supporting." It may also provide temporary income to support the disadvantaged spouse during the post-divorce economic adjustment. (citations omitted)

The next issue raised in this appeal is whether the Trial Court erred in ordering that all debts of the parties incurred as of June 18, 2000, be paid from the proceeds from the sale of the marital residence.

The record shows that the marital residence was sold pre-divorce on September 16, 2000, and the proceeds realized were placed in an interest bearing escrow account pending further order of the Court regarding their distribution. The Trial Court ordered that these funds, which totaled $82,000.00 at the time of trial, be used to pay "all the debts of the parties with balances as of June

18, 2000, including the wife's KIA". The Court also ordered that these funds be used to pay court costs and that any remaining funds be split between the parties.

Mr. Hopkins asserts that, before the divorce, then existing credit card debt was consolidated with a $20,000.00 home loan and all of this consolidated debt had been paid when the marital residence was sold in September, 2000. Mr. Hopkins contends that the credit card debt since that time did not benefit him and that Ms.Hopkins "failed to demonstrate in the proof any benefit which the Husband had received from said credit cards during the period of the parties' separation following the consolidation of the marital debt which was paid off by the home loan." Mr. Hopkins' references Ms. Hopkins' testimony that the credit cards were used by her to help an adult daughter with expenses, to purchase a mattress which she possesses and to pay for her KIA automobile. Mr. Hopkins argues that each party should be responsible for his or her own debts, with Ms. Hopkins paying the credit card debt that she has incurred. Mr. Hopkins contends that the assets for which the credit card debts were incurred went to Ms. Hopkins and the debts should follow those assets .

Mr. Hopkins relies upon the case of *Dellinger v. Dellinger*, 958 S.W.2d 778 (Tenn. Ct. App. 1997) in support of his argument regarding proper division of debt. In *Dellinger* we found that credit card debts were incurred by the wife while the parties were separated and that the husband had not benefitted from them. Noting that, as a result of the trial court's division of property and award of alimony *in solido* and division of property, the wife had sufficient resources to pay her own debt, we determined that the credit card debts should be allocated to her. At page 782 we recognized the following factors to be considered in apportioning marital debt:

> (1) which party incurred the debt and the reason for the debt;
>
> (2) which party benefitted from the loan; and
>
> (3) which party is better able to assume the debt.

First of all we note the following language from a response Ms. Hopkins filed on September 14, 2001, to Mr. Hopkins' motion to alter or amend the Trial Court's final decree:

> [W]ife avers the Court did not require the husband to share in payment of any debt after the date of the parties' separation and the record so reflects. As such the argument that wife's credit card debt incurred after separation didn't benefit husband is irrelevant. Any credit card purchases made after separation by wife are wife's responsibility pursuant to the Court's ruling.

We agree with these statements and, accordingly, it is our determination that arguments presented by either party with regard to why debts incurred after June 18, 2000, should or should not be paid are irrelevant.

At trial Ms. Hopkins submitted an itemized list of the parties' debts due at the time of their separation and the balances due are approximately equal to the amounts shown on a list of distributions to be paid from the $82,000.00 held in escrow which was filed with the apparent approval of both parties' attorneys on July 9, 2001. We agree with the Trial Court's ruling that these debts should be divided equally between the parties and we do not find that the evidence preponderates against a finding that each of the debts was either incurred jointly or that Mr. Hopkins benefitted from the loan represented.

Based upon the above referenced list filed by the parties on July 9, 2001, the total debt to be paid equals $28,437.48. Ms Hopkins testified as follows regarding the debt to Master Card MBNA which composes $3,197.26 of the total:

Q. Did [Mr. Hopkins] benefit from the use of the Master Card?
A. Yes, he did.
Q. How would you say he benefitted from the Master Card?
A. Well, when he was there, I talked to him about that before I got it. What we did was a cheaper interest rate and got that card and paid off a card we had before and we had a Citi Bank, and that was an accumulation of debt we had.
Q. Buying what and doing what with it?
A. There were lots of things. There were clothes, there was money that we had given to my daughter for her college expense, household expense.

Ms. Hopkins also testified that the debt to Washington Mutual Finance, which is listed at $391.00, was incurred for the purchase of a mattress following Mr. Hopkins' back surgery "[A]fter he had back surgery we made sure that we got a real good mattress and we went out and got it." As to the KIA automobile purchased prior to the parties' separation and upon which there was an outstanding debt of $14,022.47, it is our determination that Mr. Hopkins benefits from Ms. Hopkins possession of this car because her job as mail carrier requires that she have her own vehicle and her current employment in that position is the primary factor in our determination that rehabilitative, rather than *in futuro,* alimony is appropriate in this case.

Although the parties have submitted no evidence as to what the remaining listed debts are attributable to, the evidence does not preponderate against our presumption that, as debts incurred during the marriage and prior to separation, these debts benefitted both parties.

Finally, it is evident from our analysis of the parties earning capacities that Mr. Hopkins' ability to assume debt exceeds that of Ms. Hopkins.

Based upon the record before us, we are compelled to conclude that the Trial Court did not err in its allocations of debt in this case.

The last issue we address is whether Ms. Hopkins unlawfully disposed of marital assets by selling one of two horses in her possession after the parties separated. Ms. Hopkins asserts that she sold the horse in April, prior to the filing of the divorce and that Mr. Hopkins did not object.

T.C.A. 36-4-106(d) provides that, upon the filing of a petition for divorce on grounds other than irreconcilable differences, both parties are enjoined from disposing of marital property without the consent of the other party until the entry of a final decree. The record shows that in December of 2000, Ms. Hopkins amended her original divorce complaint, to allege grounds of inappropriate marital conduct and, therefore, she was subject to the injunction against disposition of marital property until the Court entered its final decree in June of 2001.

Although Ms. Hopkins asserts in her brief that she sold the horse in April *before* she filed her complaint for divorce in June of 2000, this assertion is contradicted by the record. While the year that the horse was sold is not specifically stated in the record, it is our finding from a review of Ms. Hopkins' testimony that she received two horses when she separated from Mr. Hopkins in June of 2000, and that she sold one of these horses thereafter in April of 2001:

Q. Now, you received your horses, is that right?

A. I have one.

Q. Yeah, but originally, way back when you had how many horses, before you all..

A. Two.

Q. And what happened to the stud horse?

A. I sold him in April to give my daughter a down payment for her home so she'd have a home.

Additionally, a settlement proposal introduced in evidence which Ms. Hopkins testified was written by her and which is dated May 21, 2000, and, therefore, *after* the time which she alleges she sold one of the two horses, provides that she receive the *horses*. It is our conclusion that, contrary to Ms. Hopkins assertion, she did not sell the horse in question in April of 2000, but rather in April of 2001 - after the divorce was filed. Furthermore, we find no evidence that this sale was effected with Mr. Hopkins' consent. When questioned in this regard, although Ms. Hopkins states that Mr. Hopkins knew of the sale, she offers no evidence that he consented:

Q. All right. So you've got a fifteen year old and no others?

A. Right.

Q. Did you sell one of them?

A. Yes.

Q. Did [Mr. Hopkins] know that you sold it?

A. Yes. I sold the black stallion back in April and gave the money to my daughter for down payment..

Q. Okay. And was [Mr. Hopkins] in agreement to that or do you know?

A. Well, he wouldn't give her the money, she asked him and he said he couldn't so I went and sold it.

It is our determination that Ms. Hopkins did violate the statutory injunction against disposition of marital assets and, accordingly, Mr. Hopkins is allowed a credit against his support obligation to the extent of $1,750.00 which amount represents Mr. Hopkins' one half of the proceeds that Ms. Hopkins testified she was paid for the horse.

Finally, we note that Scarlett Allen Beaty, counsel for the Appellant, James Franklin Hopkins, has filed a motion seeking to be relieved of her representation because she is leaving the State. Her motion, which is not supported by an affidavit, does not explain why this would justify her request. We accordingly, in light of the circumstances of the case at this time, deny the motion.

For the foregoing reasons the judgment of the Trial Court is affirmed in part and modified in part as set forth herein. This case is remanded for such further proceedings, as may be necessary, and for collection of costs below. Costs of appeal are adjudged equally to Sherry Mae Hopkins and to James Franklin Hopkins and his surety.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE