IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 17, 2006 Session

## MARY ELLEN HALL MCINTIRE v. TIMOTHY LAPLEAU MCINTIRE

Direct Appeal from the Circuit Court for Shelby County
No. CT-003442-03     Karen R. Williams, Judge

_____

No. W2004-02904-COA-R3-CV - Filed June 13, 2006

_____

The trial court granted Mother's petition in objection to Father's proposed relocation of the parties' minor children and amended parenting plan to award custody to Mother; ordered Father to repay prepaid child support to Mother; set Father's child support obligation based on his current income; ordered Father to refund sums to the children's accounts; awarded Mother the parties' timeshare property; and ordered Father to pay $30,000 of Mother's attorney's fees. We affirm in part, modify in part, reverse in part, and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part; Modified in part; Reversed in part; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and JOHN EVERETT WILLIAMS, SP. J., joined.

Marc E. Reisman, Memphis, Tennessee and Leslie G. Coleman, Memphis, Tennessee, for the appellant, Timothy Lapleau McIntire.

George Lawrence Rice, III, and Laura Diane Rogers, Memphis, Tennessee, for the appellee, Mary Ellen Hall McIntire.

### OPINION

This appeal follows an acrimonious divorce and arises from Defendant/Appellant Timothy Lapleau McIntire's (Mr. McIntire) proposed relocation with the parties' children from Memphis to Nashville. Plaintiff/Appellee Mary Ellen McIntire (Ms. McIntire) and Mr. McIntire were married in 1986. Three children were born of the marriage. The parties separated on June 1, 2002, and Ms. McIntire filed a complaint for divorce on June 19. Mr. McIntire answered and counterclaimed on July 1. The final decree of divorce was entered on September 25, 2002. The trial court awarded the divorce to Mr. McIntire on the grounds of irreconcilable differences, and incorporated the parties' marital dissolution agreement ("MDA") and parenting plan into the decree of divorce. Under the parenting plan, Mr. McIntire was awarded primary residential custody. Ms. McIntire's

presumed child support obligation was calculated based on her projected income and was paid in property as a sum total. The trial court found a downward deviation from prospectively-due child support was accordingly justified.

The parties are medical doctors. Ms. McIntire, however, did not complete her residency because the parties relocated to Mr. McIntire's place of employment and decided to start a family. Mr. McIntire also has an MBA and is a board certified pathologist. In 1999, Mr. McIntire left his medical position and subsequently attended law school. Ms. McIntire was the primary caretaker of the children.

In May 2002, one month prior to the parties' separation, Mr. McIntire began work as a summer associate with a law firm in Nashville. In February 2003, Mr. McIntire informed Ms. McIntire of his intention to relocate with the parties' children to Nashville as required by Tennessee Code Annotated § 36-5-108. On February 21, Ms. McIntire filed a petition opposing relocation and seeking to set aside or modify the final decree of divorce. In her petition, Ms. McIntire alleged that she and Mr. McIntire had been spending substantially equal time with the children until Mr. McIntire limited her visitation to the provisions of the parenting plan when she objected to his decision to relocate. She further alleged that she had entered into the MDA under duress, and moved the court to set side or modify the final decree; enjoin Mr. McIntire from interfering with her visitation and from removing the children from Shelby County; award her custody of the children and set-child support; and refund her amounts allegedly prepaid as child support.

The trial court heard the matter over eight days in May and June, 2003. On August 21, 2003, the trial court entered an order that the children shall not be relocated to Nashville and amended the parenting plan to award primary residential custody to Ms. McIntire. The court set Mr. McIntire's child support obligation at $1,955 per month based on an annual salary of $80,000; ordered Mr. McIntire to refund Ms. McIntire approximately $275,000 in prepaid child support, less a credit for an undetermined amount of child support payable by Ms. McIntire; awarded Ms. McIntire time-share property not previously specifically awarded in the original decree. Ms. McIntire filed a notice of appeal on September 22, 2003. This Court dismissed the appeal on April 15, 2004, for lack of a final judgment.

Following hearings in September 2004, on November 3, 2004, the trial court entered an order on attorney's fees, child support, and the children's "Vanguard accounts." The court ordered Mr. McIntire to repay Ms. McIntire $270,347 for prepaid child support; ordered Mr. McIntire to return funds removed from the children's Vanguard accounts; and ordered Mr. McIntire to pay $30,000 of Ms. McIntire's attorney's fees. The trial court also denied Mr. McIntire's motion to stay pending appeal. Mr. McIntire filed a notice of appeal to this Court on November 9, 2004. We affirm in part, modify in part, reverse in part, and remand.

### Issues Presented

Mr. McIntire presents the following issues, as we reword them, for our review:

(1) Whether the trial court erred by applying the wrong standard when determining whether Mr. McIntire, as primary residential parent, should have been permitted to relocate to Nashville, TN, with the parties' minor children.

(2) Whether the trial court erred by finding Ms. McIntire had prepaid child support in the amount of $270,347 and whether the trial court erred in finding it had legal authority to order reimbursement despite the finality of the earlier decree of divorce.

(3) Whether the trial court erred by ordering Mr. McIntire to return funds removed from the children's Vanguard accounts where the issue was not raised in any pleadings before the trial court, where there was no evidence regarding the actual amount removed, and where the funds were used for a perfectly permissible purpose under the applicable statutes.

(4) Whether the trial court erred by awarding timeshare property to Ms. McIntire subsequent to the time the final decree became final despite the fact that the parties' MDA which was incorporated into the final decree specifically itemized the marital property to be awarded to Ms. McIntire and awarded the timeshare to Mr. McIntire through a residuary clause providing "Husband shall receive all of the remaining assets."

(5) Whether the trial court erred by ordering Mr. McIntire to pay $30,000 of Ms. McIntire's attorney's fees.

Ms. McIntire raises the following additional issues:

(1) Whether Mr. McIntire is willfully and voluntarily underemployed for child support purposes.

(2) Whether Ms. McIntire should have been awarded more than $30,000 for attorney's fees.

### *Standard of Review*

Our standard of review of a trial court sitting without a jury is *de novo* upon the record. *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). We review the trial court's findings of fact with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). Thus, we may not reverse the trial court's factual findings unless they are contrary to the preponderance of the evidence. We review the trial court's conclusions on matters of law *de novo*, with no presumption of correctness. Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). We will not overturn a trial court's determination insofar as it is based on an

assessment of witness credibility absent clear and convincing evidence to the contrary. *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn.1999).

### *Relocation*

Mr. McIntire asserts the trial court erred by incorrectly applying Tennessee Code Annotated § 36-6-108 when determining whether he should be permitted to relocate the parties' minor children to Nashville. Mr. McIntire submits the trial court erroneously applied subsection 108(c) when it should have applied subsection 108(d), and that the trial court should have permitted relocation where it was for a reasonable purpose. The Code provides, in pertinent part:

> (c) If the parents are actually spending substantially equal intervals of time with the child and the relocating parent seeks to move with the child, the other parent may, within thirty (30) days of receipt of notice, file a petition in opposition to removal of the child. No presumption in favor of or against the request to relocate with the child shall arise. The court shall determine whether or not to permit relocation of the child based upon the best interests of the child. The court shall consider all relevant factors including the following where applicable:
>
> (1) The extent to which visitation rights have been allowed and exercised;
>
> (2) Whether the primary residential parent, once out of the jurisdiction, is likely to comply with any new visitation arrangement;
>
> (3) The love, affection and emotional ties existing between the parents and child;
>
> (4) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
>
> (5) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;
>
> (6) The stability of the family unit of the parents;
>
> (7) The mental and physical health of the parents;
>
> (8) The home, school and community record of the child;
>
> (9)(A) The reasonable preference of the child if twelve (12) years of age or older;
>
> (B) The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;
>
> (10) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; and
>
> (11) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.
>
> (d)(1) If the parents are not actually spending substantially equal intervals of time with the child and the parent spending the greater amount of time with the child proposes to relocate with the child, the other parent may, within thirty (30) days of

receipt of the notice, file a petition in opposition to removal of the child. The other parent may not attempt to relocate with the child unless expressly authorized to do so by the court pursuant to a change of custody or primary custodial responsibility. The parent spending the greater amount of time with the child shall be permitted to relocate with the child unless the court finds:

(A) The relocation does not have a reasonable purpose;

(B) The relocation would pose a threat of specific and serious harm to the child that outweighs the threat of harm to the child of a change of custody; or

(C) The parent's motive for relocating with the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

(2) Specific and serious harm to the child includes, but is not limited to, the following:

(A) If a parent wishes to take a child with a serious medical problem to an area where no adequate treatment is readily available;

(B) If a parent wishes to take a child with specific educational requirements to an area with no acceptable education facilities;

(C) If a parent wishes to relocate and take up residence with a person with a history of child or domestic abuse or who is currently abusing alcohol or other drugs;

(D) If the child relies on the parent not relocating who provides emotional support, nurturing and development such that removal would result in severe emotional detriment to the child;

(E) If the custodial parent is emotionally disturbed or dependent such that the custodial parent is not capable of adequately parenting the child in the absence of support systems currently in place in this state, and such support system is not available at the proposed relocation site; or

(F) If the proposed relocation is to a foreign country whose public policy does not normally enforce the visitation rights of non-custodial parents, that does not have an adequately functioning legal system or that otherwise presents a substantial risk of specific and serious harm to the child.

Tenn. Code Ann. § 36-6-108(c) & (d)(2005). Mr. McIntire asserts the trial court erred in finding that the parties spent substantially equal time with the children and in basing its holding on a best interest analysis under 108(c). He asserts that the trial court should have permitted relocation under 108(d) where the parenting plan clearly provides that the children would be with Ms. McIntire approximately twenty-five percent of the time.

We begin our analysis by noting that Mr. McIntire does not contend that the trial court erred in determining that relocation was not in the best interests of the children. He does not argue that the court misapplied 108(c). Rather, he asserts the trial court erred in its factual determination that the parties spent substantially equal time with the children and that, under 108(d), the trial court should have permitted relocation where it was for a reasonable professional purpose and not vindictive.

-5-

Subsection 108(c) requires the court to engage in a best interest analysis when determining whether to permit relocation of the children when the parents are "actually spending substantially equal intervals of time with the child[ren]." Tenn. Code Ann § 36-6-108(c). However, when the parents are not actually spending substantially equal amounts of time with the children and the parent spending the greater amount of time with children proposes to relocate with the children, relocation will be permitted unless relocation does not have a reasonable purpose, poses a threat of specific and serious harm to the children, or the parent's motive for relocating is vindictive. Tenn. Code Ann. § 36-6-108(d); *Kawatra v. Kawatra*, 182 S.W.3d 800, 805 (Tenn. 2005). Although the Code does not define how courts are to determine what constitutes "substantially equal time," our supreme court has stated:

> To determine the number of days to credit to each parent for purposes of Tennessee Code Annotated section 36-6-108(c) and (d), the trial court should first examine the provisions of the residential schedule. The trial court should then consider additional time each parent spent with the child that is not reflected in the residential schedule. If either parent violated the terms of the residential schedule by interfering with the other parent's time with the child, the trial court should make any necessary adjustments to reflect the time that the child should have been in the care of the other parent. To allocate a day to one parent when both parents claim credit for that day, the trial court should examine 1) the hours each parent actually spent with the child on that day; 2) the activities in which each parent engaged with the child; 3) the resources the parent expended on the child's behalf during that time period, including the costs of a meal or any other costs directly related to that parent's care and supervision of the child; and 4) any other factor that the trial court deems relevant.

*Kawatra*, 182 S.W.3d at 803-04. Although the terms of a parenting plan or custody order are relevant to the consideration of whether 108(c) or 108(d) is applicable, they are not determinative. *Id.* Rather, the court must determine, as a factual matter, whether the parents have spent substantially equal time with the children. *See id.; Placencia v. Placencia*, 48 S.W.3d 732, 737 (Tenn. Ct. App. 2000)(Lillard, J. concurring). As this Court previously has noted, the determination of which subsection is applicable often is difficult when the circumstances and the division of time have fluctuated. *Placencia*, 48 S.W.3d at 737.

In this case, the parenting plan clearly provides Mr. McIntire a greater amount of parenting time. However, the trial court found the parties had spent substantially equal time with the children and that:

> [t]he parties negotiated the PPP [parenting plan] over several months and executed it on August 16, 2002. Father promised Mother that she would have more parenting time with the children than the times provided for in the PPP. In fact, this occurred until Father finally formally advised Mother that he had taken a job in Nashville and would be moving with the children. When Mother objected, Father reduced her time with the children to the exact terms of the PPP. Father testified that he did not take

domestic relations until the Fall of 2002 and infers he was not aware of the body of law prior to that time. The [c]ourt does not accept this inference . . . and his conduct reflects that he understood family law issues as he negotiated the PPP and planned his move to Nashville. As soon as Mother objected to the move, he reduced her time with the children to the minimum provided for in the PPP so as to create a situation where the parents were "not actually spending substantially equal intervals of time" with the children. During the course of this litigation, Father continued to limit Mother's time with the children even when he was in Missouri litigating his other case. Based on his conduct, the [c]ourt finds that Father used his superior knowledge of the law to manipulate Mother so as to secure an advantage relative to the children.

The trial court further found that Mr. McIntire had accepted a position with a law firm in Nashville as early as August 2002, but that he "willfully did not tell Mother this significant fact for several months even though she kept asking about his job situation." The trial court found Mr. McIntire had allowed Ms. McIntire to believe she would have daily access to the children and that he had "admitted that he withheld the information until late December." The trial court determined Mr. McIntire's behavior constituted a "fraud upon Mother and the [c]ourt." Interestingly, the trial court stated that "[b]oth parties failed to impress the [c]ourt with their testimony," but found that Mr. McIntire "appeared to try to manipulate his answers" which "added credibility to Mother's argument that he trapped her into agreeing to the PPP."

We cannot say the evidence preponderates against the findings of the trial court in this case. Although Ms. McIntire's time with the children was limited to the terms of the parenting plan at the time Ms. McIntire filed her petition opposing relocation in February 2003, Ms. McIntire clearly spent substantially more time with the children immediately prior to entry of the parenting plan in August 2002, particularly during the period of Mr. McIntire's internship in Nashville from May to August, 2002. Further, the evidence does not preponderate against the trial court's determination that the parties had been spending substantially equal amounts of time with the children until Mr. McIntire limited Ms. McIntire's parenting time when she objected to his proposed relocation. The trial court's determinations in this case rest largely on the court's assessment of witness credibility and will not be overturned absent clear and convincing evidence to the contrary. Accordingly, we affirm application of § 36-6-108(c). As noted above, Mr. McIntire does not assert that the trial court erred in its best interest of the child analysis under § 36-6-108(c). We affirm on this issue.

### *Prepaid Child Support*

This case again highlights the problematic nature of child support agreements which skirt the child support guidelines. In the present case, Mr. McIntire received a substantially greater share of marital property and the parties agreed that the value of this property would meet or exceed Ms. McIntire's child support obligations under the guidelines based on her projected income. Ms. McIntire asserts Mr. McIntire received $275,000 in property as prepaid child support. Mr. McIntire asserts the $275,000 in property was not prepaid child support and that, even if it is, the trial court is without authority to order him to return it to Ms. McIntire.

-7-

Mr. McIntire contends the trial court erred in ordering him to refund to Ms. McIntire $275,000 in prepaid child support, less the amount of support which Ms. McIntire would have paid from September 1, 2002, until July 2003, based on her actual earnings for that period. Mr. McIntire's argument, as we perceive it, is two-fold. First, Mr. McIntire asserts that Ms. McIntire did not prepay any child support. Rather he asserts the parties agreed to a downward deviation in child support to zero merely in recognition of an unequal property division, and that the parties did not agree that Ms. McIntire was, in essence, paying her child support with a share of marital property.

We find this argument to be disingenuous at best. The parenting plan proposed by Mr. McIntire and entered by the trial court in September 2002 states:

> When you consider the additional $275,000.00 [in marital property] Father is receiving . . . Mother is prepaying this child support in an amount that adequately covers what her child support obligation would be during the minority of all three (3) of the parties' minor children.

Although the trial court's final order recognized this agreement as justifying a downward deviation from the child support guidelines, the parties and the court clearly construed Ms. McIntire to be prepaying child support in the form of property.

Regardless of what is stated in a decree of divorce, the duty of child support cannot be bargained away, and agreements not to seek future increases in support are void as against public policy. *Berryhill v. Rhodes*, 21 S.W.3d 188, 193 (Tenn. 2000). Any deviation from the guidelines must be justified. In this case, the parenting plan and trial court's order, read together, clearly demonstrate that the trial court deviated from the guidelines in setting child support because Ms. McIntire had prepaid her child support obligation in the form of property. Additionally, the "deviation" in the child support provision was not a deviation in the amount of support owed, but only in the amount prospectively due. The amount of support was calculated at the guideline amount based on Ms. McIntire's projected earning capacity of $75,000 per year. In their parenting plan, the parties also acknowledged that the child support order remained modifiable by the court.

Mr. McIntire additionally asserts that, assuming Ms. McIntire did prepay child support, the trial court did not have the authority to order repayment because such repayment would work an unlawful retroactive modification. Clearly, a child support order is not retroactively modifiable, but may be modified only as of the date a petition for modification is filed. Tenn. Code Ann. § 36-5-101(a)(5)(2005); *Rutledge v. Barrett*, 802 S.W.2d 604, 606 (Tenn. 1991). In this case, however, ordering Mr. McIntire to return amounts prepaid by Ms. McIntire, less amounts due for the period in which Mr. McIntire had primary custody of the children, does not work a retroactive modification. Rather, the modification is prospective. It relieves Ms. McIntire of her child support obligation upon change of custody. Moreover, as noted, in addition to acknowledging that Ms. McIntire was prepaying child support, the parties acknowledged and provided for the possibility of modification in the parenting plan. The parenting plan provides:

The parties affirmatively acknowledge that Court approval must be obtained before child support can be reduced or modified, unless such payments are automatically reduced or terminated under the terms of the Parenting Plan.

Clearly, Ms. McIntire's child support obligation was terminated upon change of custody of the parties' children. We affirm the trial court's determination that Ms. McIntire prepaid child support in the amount of $275,000 and that this obligation remained modifiable under the terms of the parenting plan.

However, the trial court erred in determining the date of modification and in its determination of amounts to be credited to Mr. McIntire. Child support is modifiable only as of the date a petition to modify is filed with the court. In this case, Ms. McIntire filed her petition in opposition to relocation and to set aside or modify the final decree of divorce on February 21, 2003. In her petition to set aside the final decree, Ms. McIntire asserted she had prepaid child support based on a projected annual income of $60,000, but that her actual income for 2002 was $13,000. She asserted the correct child support obligation for 2002 was $2,328.

In its order of August 2003, the trial court ordered Mr. McIntire to refund Ms. McIntire prepaid child support of $275,000, less a credit for the amount of child support Ms. McIntire would have been obligated to pay from September 1, 2002, until July 2003, based on her actual earnings. In its November 3, 2004, order, the trial court set the refund at $270,000. However, reading Ms. McIntire's petition to set aside the final decree of divorce as a petition to modify, the amount of her child support obligation was modifiable only from the date of her petition, February 21, 2003. Thus, Mr. McIntire is entitled to a credit from the refund amount in an amount equal to the child support guideline amount for three children based on an income of $75,000 from August 2002 through February 2003, and based on an income of $13,000 from February 2003 through July 2003, when Ms. McIntire's child support obligation ended upon change of custody. We remand to the trial court for determination of the credit due Mr. McIntire and for entry of an order requiring Mr. McIntire to repay Ms. McIntire $275,000, less the credit, within thirty (30) days of entry of the order.

### The "Vanguard Accounts"

In its November 2004 order, the trial court ordered Mr. McIntire to refund funds which he had taken from accounts established for the benefit of the parties' children under the Uniform Gift to Minors Act ("the UGMA"). The order states:

[Mr.] Timothy McIntire shall immediately return the funds removed from the children's respective Vanguard Accounts. The amount returned shall be the amount the children would have had if the funds had never been removed. First Tennessee shall be the Trustee of the funds, which shall be used for the children's educational expenses after high school. Neither party shall be permitted to withdraw funds from the account without the consent of the other party. Should the parties disagree on the

-9-

amount of use of the funds, the trustee from First Tennessee shall have final decision-making authority.  The fees for the Trustee shall be paid from the accounts.

Mr. McIntire asserts the trial court erred in requiring him to refund the Vanguard funds for four reasons: (1) compliance with the order is impossible; (2) the trial court ruled on an  issue that was not properly before the court; (3) there was insufficient evidence to support the court's order; (4) Mr. McIntire's use of the funds was permissible under the applicable statutes.

We first dispense with Mr. McIntire's argument that the trial court ruled on an issue not properly before it.  Although, as Mr. McIntire asserts, the issue was not raised in the pleadings, it clearly was tried by consent.  "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tenn. R. Civ. P. 15.02.  Ms. McIntire raised the issue at least as early as the November 26, 2003, hearing before the trial court, and the transcript of the November hearing indicates that the issue initially had been addressed by the parties and the court in August, 2003.   At the November hearing, counsel for Mr. McIntire stated:  "Now, the Vanguard account . . . That's an unresolved issue I said I was going to get, because that's here."  Mr. McIntire did not object, but conceded to having taken funds from the account, submitting they were properly used under the UGMA to pay for the children's educational expenses.  Additionally, Mr. McIntire agreed that the appropriate way to resolve the issue was with an accounting and, after much discussion, the parties agreed that Mr. McIntire would provide an accounting by January 6, 2004.  Mr. McIntire provided his accounting in May 2004, and the matter was again heard in September 2004.  Mr. McIntire's argument that the trial court ruled on an issue not properly before the court is without merit.

Mr. McIntire also asserts there was insufficient evidence to support the trial court's order.  Mr. McIntire asserts: "To say that the preponderance of the evidence does not support the trial court's ruling is an understatement.  There was no evidence presented by Ms. McIntire."   Mr. McIntire concedes, however, both here and in the trial court, that he removed funds from the children's Vanguard accounts. The only question before the court with respect to these accounts was whether Mr. McIntire removed the funds for appropriate purposes.  Mr. McIntire submits he withdrew funds from the accounts to reimburse himself for amounts expended for the children's private school tuition and other educational expenses.   Ms. McIntire asserts the accounts expenditures were pre-divorce expenditures, that the funds were depleted after the divorce, and that Mr. McIntire used the funds to pay his attorney's fees.  Mr. McIntire suggested that an accounting was the best way to resolve the issue.  The transcript of the September 2004 hearing indicates the trial court received cancelled personal checks from Mr. McIntire dating from 2000, and that between July and September 2002 Mr. McIntire depleted the funds.  Mr. McIntire simply failed to provide an accounting that would demonstrate proper use of the funds.  Therefore, the trial court's determination was largely one of credibility which we will not overturn absent clear and convincing evidence to the contrary.  Accordingly, we affirm the trial court's determination that Mr. McIntire improperly removed funds from the children's Vanguard accounts.

We agree with Mr. McIntire, however, that the trial court's order is impossible to comply with where it specifies no amount to be refunded. We read the trial court's order as requiring Mr. McIntire to return all amounts taken from the fund since the decree of divorce was entered in 2002. The exact amount taken, however, is unclear from the record before us. The transcript indicates this amount to be between $102,000 and $130,000. We remand to the trial court for determination of the exact amount removed by Mr. McIntire from the Vanguard accounts established for the children under the UGMA, and for entry of an order requiring Mr. McIntire to refund that amount to the accounts.

### *The Time-Share Property*

In its August 2003 order, the trial court awarded time-share property to Ms. McIntire based on a finding that "[d]uring the negotiations neither party identified the time share as a marital or separate asset. In light of all that was on the table to be divided, the [c]ourt is not surprised that this asset was overlooked. Since it has now been identified, the [c]ourt finds that it is a marital asset and awards it to Mother." Mr. McIntire asserts that the time-share was contemplated by the parties during settlement negotiations and was awarded to Mr. McIntire through a "residual clause" in the parties' MDA. The MDA incorporated by the court in the 2002 decree provides for the division of a considerable marital estate and contains six provisions relating to the division of the parties' property. The sixth provision provides:

> Husband shall receive all of the remaining marital assets; as it relates to any real estate other than the JCMG Building, which includes the parties' marital residence, Wife shall sign any documents necessary to transfer such real estate to Husband.

Additionally, e-mail correspondence between the parties during the course of the negotiations includes reference to the time-share property.

A marital dissolution agreement is essentially a contract executed by the parties in contemplation of divorce proceedings. *E.g., Gray v. Estate of Gray*, 993 S.W.2d 59, 63 (Tenn. Ct. App. 1998). A property settlement provision of an MDA is "within the category of contracts and is to be looked upon and enforced as an agreement, and is to be construed as other contracts as respects its interpretation, its meaning and effect." *Id.* (citations omitted). The interpretation of a contract is a matter of law. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). When interpreting the provisions of an MDA that retain their contractual nature, we apply general contract principles, seeking to ascertain and effectuate the intent of the parties at the time the agreement was executed. *Buettner v. Buettner*, 183 S.W.3d 354, 358 (Tenn. Ct. App. 2005). We construe the various provisions of a contract together, giving effect to each provision and ascertaining the intention of the parties based upon the usual, natural, and ordinary meaning of the language they employed. *Id.*

We agree with Mr. McIntire that the parties' MDA provided for the division of all property, that the time-share property was addressed in correspondence between the parties, and that Mr.

McIntire was awarded the property through the "residual clause." We reverse the trial court on this issue.

### *Willful and Voluntary Unemployment*

The trial court set Mr. McIntire's child support obligation at the guideline amount based upon an undisputed annual salary of $80,000 as a first year associate in a major law firm. Ms. McIntire asserts the trial court erred where Mr. McIntire had earned $450,000 in prior years as a medical doctor and potentially would earn considerably more than $80,000 as a practicing attorney. Mr. McIntire, on the other hand, asserts his prospective child support obligation cannot be based on his past income; that the parties agreed that he would leave the practice of medicine to attend law school before they contemplated divorce; and that the trial court properly based his child support obligation on his present income.

Although courts are inclined to find willful and voluntary underemployment when a party with child support obligations voluntarily leaves his employment and chooses to accept a job which provides significantly less income, whether a party is willfully and voluntarily underemployed is a question of fact, and the trial court has considerable discretion in its determination. *Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001). In making its determination, the trial court must consider the party's past and present employment and whether the party's choice to accept a lower paying job was reasonable and made in good faith. *Id.*

In the current case, the parties do not cite us to a finding by the trial court regarding whether Mr. McIntire is voluntarily underemployed, and we find none. Rather, the arguments presented on appeal are predicated on the trial court's determination of Mr. McIntire's income for child support purposes. It is undisputed that Mr. McIntire was terminated from his previous employment in the medical field; that he attended law school during the course of the parties' marriage; and that he sought and obtained a position with a major law firm upon graduating from law school. It is undisputed that his annual income as a first-year associate was $80,000. We affirm setting of Mr. McIntire's child support obligation based on his current income as a practicing attorney.

### *Attorney's Fees*

Ms. McIntire incurred attorney's fees in excess of $100,000. She submits that $44,700 in fees were associated with issues regarding the change of custody and that an additional $14,600 in fees were incurred to revise the parenting plan. She also contends that fees in the amount of $70,000 were associated with relocation matters. The trial court awarded Ms. McIntire attorney's fees in the amount of $30,000.

Both parties assert the trial court erred in the award of attorney's fees to Ms. McIntire. Mr. McIntire asserts the award of $30,000 was in error where the relocation statutes do not provide for attorney's fees and where the award exceeds attorney's fees associated with the custody issues. He submits that Ms. McIntire incurred attorney's fees in the amount of $3,600 with respect to the

custody issues. Ms. McIntire, on the other hand, submits the trial court erred by not awarding her the full amount of attorney's fees where the relocation matter falls within the purview of Tennessee Code Annotated § 36-5-103(c) when it effectuates a change in custody. She alternately submits that if she is not entitled to attorney's fees for fees incurred with respect to the relocation issue, the trial court erred by not awarding her all fees associated with the custody issues, which total $59,300.

The question of the appropriate amount of attorney's fees to be awarded is largely left to the discretion of the trial court. *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn.1995). Upon appeal, we generally will not disturb the trial court's decision unless the evidence preponderates against it. *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App.1992). We affirm.

### *Holding*

We affirm the trial court's judgment with respect to relocation of the children and change of custody to Ms. McIntire. We also affirm the trial court's determination that Ms. McIntire has prepaid child support in the amount of $275,000. We affirm the trial court's order requiring Mr. McIntire to repay Ms. McIntire $275,000, less a credit for amounts Ms. McIntire would have been obligated to pay during the time the children were in the custody of Mr. McIntire. We remand for a determination of the amount of this credit consistent with this opinion. We affirm the trial court's order requiring Mr. McIntire to refund actual sums taken from the children's Vanguard accounts, and remand for a specific determination of that amount. We reverse the trial court's order awarding the parties' time-share property to Ms. McIntire, and hold the property was awarded to Mr. McIntire through the residual clause in the parties' MDA. We affirm the trial court's setting of Mr. McIntire's child support obligation based on his current income. We affirm the award of attorney's fees to Ms. McIntire in the amount of $30,000. We deny Ms. McIntire's request for attorney's fees on appeal.

This cause is remanded to the trial court for further determinations consistent with this opinion. Costs of this appeal are taxed one-half to Appellee Mary Ellen Hall McIntire and one-half to Appellant Timothy Lapleau McIntire and his surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

-13-